**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | | |
|---|---|---|
| INNOVATION TECHNOLOGIES PARTNERS, LP, | § § § | |
| *Plaintiff,* | § | Case No. ____________ |
| v. | § § § | |
| IRDETO B.V. AND IRDETO SECURITY B.V., | § § § | Jury Trial Demanded |
| *Defendants.* | § § § | |

**PLAINTIFF'S COMPLAINT**

Plaintiff Innovation Technologies Partners, LP ("ITP") files this suit against Defendants Irdeto B.V. and Irdeto Security B.V. (collectively "Irdeto") for patent infringement and alleges, with personal knowledge as to its own actions and on information and belief as to the actions of others, as follows:

**The Parties**

1. Plaintiff ITP is a Texas Limited Partnership with a principal place of business at 211 E 7th Street, Suite 620, Austin, TX 78701.

2. Defendant Irdeto B.V. is a Netherlands corporation with its principal place of business at Taurusavenue 105 2132 LS Hoofddorp, The Netherlands. Irdeto B.V. may be served pursuant to Fed. R. Civ. P. 4(f)(1).

3. Defendant Irdeto Security B.V. is a Netherlands corporation with its principal place of business at Taurusavenue 105 2132 LS Hoofddorp, The Netherlands. Irdeto Security B.V. may be served pursuant to Fed. R. Civ. P. 4(f)(1).

**Jurisdiction & Venue**

4. This Court has subject matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1338(a) because it arises under the patent laws of the United States, 35 U.S.C. §§ 1 *et seq*.

5. Irdeto is subject to this Court's personal jurisdiction consistent with the principles of due process and/or the Texas Long Arm Statute. Tex. Civ. Prac. & Rem. §§ 17.041, *et seq*.

6. This Court has personal jurisdiction over Irdeto at least because Irdeto conducts business in this District and throughout the state of Texas. For example, Irdeto has sold, integrated, and supported its infringing products and services to customers based in Texas including at least its Denuvo product to Texas-based video-game developers such as Gearbox Software in Frisco, TX, and its Cloakware product to other customers in Texas.[1]

7. This Court also has personal jurisdiction over Irdeto because Irdeto has committed acts of patent infringement in this District and throughout Texas, including selling, and offering for sale, products and services that infringe ITP's Asserted Patents.

8. This Court also has personal jurisdiction over Irdeto because Irdeto has placed infringing products and services into the stream of commerce, with the expectation they will be purchased and used by customers in Texas and in this District, such that customers in Texas and in this District have purchased and used, and continue to purchase and use, Irdeto's infringing products and services, which has allowed Irdeto to derive substantial benefits from infringing acts in Texas and in this District.

9. Venue is proper in this District against Irdeto pursuant to 28 U.S.C. §§ 1391 and

---

[1] *See* Emily Gera, *Borderlands 3 Launches with Denuvo Anti-Tamper DRM*, VG247 (Aug. 15, 2019) https://www.vg247.com/borderlands-3-launches-denuvo-drm; *Gearbox Software/2K Ink Consumer Products Deals for the Highly-Anticipated Release of Borderland 3*, Gearbox Entertainment, https://www.gearboxsoftware.com/press_release/borderlands-3-consumer-product-partners-unveiled/ (last visited Jun. 1, 2026).

1400(b).

10. Venue is proper in this District under 28 U.S.C. § 1391(c)(3) because Irdeto is a foreign corporation that is not a resident of the United States. Venue is also proper because Irdeto is subject to the personal jurisdiction of this Court, as set forth above, and has committed patent infringement in this District.

11. Irdeto has previously been a party to patent infringement litigation in this District, did not contest jurisdiction and venue, and instead brought its own patent infringement and declaratory judgment counterclaims. In doing so, Irdeto has availed itself of the power and benefits of this Court.[2]

## Factual Background

12. In today's world, everything runs on software. However, software developers have a problem: their software runs on devices they do not control. With unrestricted access to user devices, bad actors can—and do—attempt to reverse-engineer, modify, pirate, or otherwise tamper with valuable software. When those attempts succeed, everyone loses: the developers, the legitimate users who paid for access, and the broader marketplace that depends on the software working as designed.

13. Self-protection technology allows software programs and applications to defend against attacks by inserting self-checking or integrity verification code sequences that verify, including at startup and runtime, whether portions of the program have been improperly modified. For example, when a self-checking code sequence detects that a portion of the program has been tampered with, the program can trigger a tamper response mechanism, such as terminating the

---

[2] *See SZ DJI Technology Co., Ltd. v. Irdeto B.V. and Irdeto Security B.V.*, Case No. 2:25-CV-1066-RWS-RSP (E.D. Tex. Oct. 24, 2025).

user's session, recording and reporting the detection, or limiting functionality. Self-protection technology also includes obfuscation techniques that render protected programs more difficult to read, analyze and modify. In this way, self-checking, obfuscation and integrity verification technology allow software programs to defend themselves, even when running on a hostile user device. Irdeto says it best: "code protection and obfuscation is often the last and most critical line of defense," and, once a program is protected, "these applications can be safely deployed on untrusted hosts and in hostile environments."[3]

14. Self-protection mechanisms via self-checking, obfuscation, or integrity verification technology are indispensable to two of the largest digital industries: video games and video entertainment. The video game and video entertainment industries generated approximately $188.8 and $150 billion in revenue in 2025, respectively.[4] A substantial portion of those billions was derived from software running on consumer devices that the software developer cannot control and, therefore, cannot trust. Both of these lucrative industries are under constant attack from large-scale piracy and tampering, and both require on-device software protection, including self-checking, obfuscation, and integrity verification, to defend against those threats.

15. Irdeto sits at the center of both industries and is "the world leader in digital platform cybersecurity," with its protection spanning over 6 billion devices and counting.[5] As described

---

[3] *Irdeto End-to-End Piracy, Our 5-step Program for Anti-Piracy and Cybersecurity Management*, Irdeto, https://irdeto.com/hubfs/resources/e-books/5-step-program-for-anti-piracy.pdf (last visited Jun. 1, 2026).

[4] *Newzoo's Global Games Market Report 2025*, Newzoo, https://newzoo.com/resources/trend-reports/newzoo-global-games-market-report-2025 (last visited Jun. 1, 2026); Laren Liversedge, *Global Streaming Revenue Hits $150bn in 2025, set to Pass $200bn by 2030*, Ampere (Mar. 30, 2026) https://www.ampereanalysis.com/insight/global-streaming-revenue-hits-150bn-in-2025-set-to-pass-200bn-by-2030.

[5] *Protect Your Assets, Safeguard Your Operations and Innovate with Confidence*, Irdeto, https://irdeto.com/ (last visited Jun. 1, 2026).

below, Irdeto's commercial success is built on the very self-checking, obfuscation or integrity verification technology claimed in the Asserted Patents at issue in this suit.

16. But while Irdeto brags about being the current "world leader," it was not the world's first. Before Irdeto introduced its self-checking, obfuscation, or integrity verification technology, Intertrust Technologies Corporation ("Intertrust") began developing the technology at issue in this case.

17. Back in the early 2000s, Intertrust successfully applied for patents to protect its valuable intellectual property. These patents are directed at innovations for self-checking mechanisms to improve software tamper resistance and reliability, obfuscation techniques that disguise a program's internal structure, and integrity-checking techniques that are embedded into software programs and applications for security and protection.

18. On August 25, 2009, the United States Patent and Trademark Office duly and legally issued U.S. Patent No. 7,581,103 (the "'103 Patent"), entitled "Software Self-Checking Systems and Methods." The '103 patent is publicly available.[6] ITP owns all rights, titles, and interests in the '103 Patent.

19. On August 17, 2010, the United States Patent and Trademark Office duly and legally issued U.S. Patent Nos. 7,779,270 (the "'270 Patent") and 7,779,394 (the "'394 Patent"), entitled "Software Self-Defense Systems and Methods." The '270 Patent and '394 Patent are publicly available.[7] ITP owns all rights, titles, and interests in the '270 Patent and '394 Patent.

20. On October 26, 2010, the United States Patent and Trademark Office duly and legally issued U.S. Patent No. 7,823,135 (the "'135 Patent"), entitled "Software Self-Defense

---

[6] *See, e.g.*, https://patents.google.com/patent/US7581103B2/.
[7] *See, e.g.*, https://patents.google.com/patent/US7779270B2/ and https://patents.google.com/patent/US7779394B2/.

Systems and Methods." The '135 Patent is publicly available.[8] ITP owns all rights, titles, and interests in the '135 Patent.

21. On August 16, 2011, the United States Patent and Trademark Office duly and legally issued U.S. Patent No. 8,001,388 (the "'388 Patent"), entitled "Software Self-Checking Systems and Methods." The '388 Patent is publicly available.[9] ITP owns all rights, titles, and interests in the '388 Patent.

22. On January 8, 2013, the United States Patent and Trademark Office duly and legally issued U.S. Patent No. 8,352,747 (the "'747 Patent"), entitled "Software Self-Checking Systems and Methods." The '747 Patent is publicly available.[10] ITP owns all rights, titles, and interests in the '747 Patent.

23. On April 29, 2014, the United States Patent and Trademark Office duly and legally issued U.S. Patent No. 8,713,326 (the "'326 Patent"), entitled "Software Self-Checking Systems and Methods." The '326 Patent is publicly available.[11] ITP owns all rights, titles, and interests in the '326 Patent.

24. On September 22, 2015, the United States Patent and Trademark Office duly and legally issued U.S. Patent No. 9,141,788 (the "'788 Patent"), entitled "Software Self-Checking Systems and Methods." The '788 Patent is publicly available.[12] ITP owns all rights, titles, and interests in the '788 Patent.

25. On April 24, 2018, the United States Patent and Trademark Office duly and legally issued U.S. Patent No. 9,953,159 (the "'159 Patent"), entitled "Software Self-Checking Systems

---

[8] *See, e.g.*, https://patents.google.com/patent/US7823135B2/.
[9] *See, e.g.*, https://patents.google.com/patent/US8001388B2/.
[10] *See, e.g.*, https://patents.google.com/patent/US8352747B2/.
[11] *See, e.g.*, https://patents.google.com/patent/US8713326B2/.
[12] *See, e.g.*, https://patents.google.com/patent/US9141788B2/.

and Methods." The '159 Patent is publicly available.[13] ITP owns all rights, titles, and interests in the '159 Patent.

26. On September 24, 2019, the United States Patent and Trademark Office duly and legally issued U.S. Patent No. 10,423,779 (the "'779 Patent"), entitled "Software Self-Checking Systems and Methods." The '779 Patent is publicly available.[14] ITP owns all rights, titles, and interests in the '779 Patent.

27. On December 3, 2019, the United States Patent and Trademark Office duly and legally issued U.S. Patent No. 10,496,814 (the "'814 Patent"), entitled "Software Integrity Checking Systems and Methods." The '814 Patent is publicly available.[15] ITP owns all rights, titles, and interests in the '814 Patent.

28. On December 22, 2020, the United States Patent and Trademark Office duly and legally issued U.S. Patent No. 10,872,146 (the "'146 Patent"), entitled "Software Integrity Checking Systems and Methods." The '146 Patent is publicly available.[16] ITP owns all rights, titles, and interests in the '146 Patent.

29. On December 20, 2022, the United States Patent and Trademark Office duly and legally issued U.S. Patent No. 11,531,751 (the "'751 Patent"), entitled "Software Integrity Checking Systems and Methods." The '751 Patent is publicly available.[17] ITP owns all rights, titles, and interests in the '751 Patent.

30. On November 28, 2023, the United States Patent and Trademark Office duly and

---

[13] *See, e.g.*, https://patents.google.com/patent/US9953159B2/.
[14] *See, e.g.*, https://patents.google.com/patent/US10423779B2/.
[15] *See, e.g.*, https://patents.google.com/patent/US10496814B2/.
[16] *See, e.g.*, https://patents.google.com/patent/US10872146B2/.
[17] *See, e.g.*, https://patents.google.com/patent/US11531751B2/.

legally issued U.S. Patent No. 11,829,469 (the "'469 Patent"), entitled "Software Integrity Checking Systems and Methods." The '469 Patent is publicly available.[18] ITP owns all rights, titles, and interests in the '469 Patent.

31. On March 18, 2025, the United States Patent and Trademark Office duly and legally issued U.S. Patent No. 12,254,085 (the "'085 Patent"), entitled "Software Integrity Checking Systems and Methods." The '085 Patent is publicly available.[19] ITP owns all rights, titles, and interests in the '085 Patent.

32. Collectively, the '103 Patent, '135 Patent, '388 Patent, '747 Patent, '326 Patent, '788 Patent, '159 Patent, '779 Patent, '814 Patent, '469 Patent, and '085 Patents are referred to as the "Asserted Patents."

33. The Asserted Patents are valid, enforceable, and duly issued in full compliance with Title 35 of the United States Code.

34. ITP has complied with any applicable marking and/or notice requirements of 35 U.S.C. § 287.

35. ITP is the sole and exclusive owner of all right, title, and interest to and in the Asserted Patents and holds the exclusive right to take all actions necessary to enforce its rights to the Asserted Patents, including the filing of this patent infringement lawsuit. ITP also has the right to recover all damages for past, present, and future infringement of the Asserted Patents and to seek injunctive relief as appropriate under the law.

36. As discussed above, Irdeto markets itself as the "world leader in digital platform cybersecurity" and offers products and services that "empower businesses in video entertainment,

---

[18] *See, e.g.*, https://patents.google.com/patent/US11829469B2/.
[19] *See, e.g.*, https://patents.google.com/patent/US12254085B2/.

video games, and connected industries."[20] Industry analysts agree. In 2022, Irdeto led the managed content-security solutions market with a 21.9% share, more than double its share from less than ten years earlier.[21] Irdeto built its success by deploying, across multiple industries and multiple products, the very self-checking, obfuscation, integrity verification technology claimed in the Asserted Patents.

37. Irdeto's video game protection program, Denuvo, has a series of features that performs the very functions claimed in the Asserted Patents. Irdeto itself represents that Denuvo's "[s]ystem integrity checks" "[v]alidate[] execution environment before launching"; its "[a]ctive anti-tampering" "[d]etects and responds stealthily to runtime code or memory manipulation"; its "[i]ntegrity verification" "[v]alidates code and data at startup and runtime"; and its "[i]njection prevention" "[b]locks code injection and unauthorized module loading."[22]




38. Irdeto's video entertainment protection includes a five-step, end-to-end, anti-piracy and cybersecurity program, recognized as the "2024 best anti-piracy solution," encompassing

[20] *Protect Your Assets, Safeguard Your Operations and Innovate with Confidence*, *supra* note 5.
[21] *New Report Reveals Irdeto is the Leader in Managed Security*, Irdeto (Feb. 29, 2024) https://irdeto.com/news/new-report-reveals-irdeto-is-the-leader-in-managed-security.
[22] *Anti-Tamper*, Irdeto, https://irdeto.com/video-games/denuvo-anti-cheat/anti-tamper (last visited Jun. 1, 2026).

prevention and platform hardening, monitoring and detection, investigation and analysis, and reporting and enforcement.[23] At the heart of the program are "anti-tamper," "application code protection and obfuscation," and investigation and reporting—the same self-checking, obfuscation, integrity verification technology claimed in the Asserted Patents.




39. Further, Irdeto's Cloakware Software Protection, winner of the 2021 CyberSecurity Excellence Awards, protects programs and applications across multiple industries.[24] Cloakware's features include "integrity verification" that "checks the integrity of signed applications," "detects tampering by attackers," and "checks the code prior to loading as well as during run time," along

---

[23] *Video Anti-Piracy and Cybersecurity*, Irdeto, https://irdeto.com/video-entertainment/irdeto-anti-piracy (last visited Jun. 1, 2026).

[24] *Cloakware Software Protection by Irdeto*, Cybersecurity Excellence Awards, https://cybersecurity-excellence-awards.com/candidates/cloakware-software-protection-by-irdeto/ (last visited Jun. 1, 2026); *API Protection for PSPs for Web & Mobile Applications*, Cloakware by Irdeto, https://d2uav5q06z9nv6.cloudfront.net/5f8ff4887a4e81372abac654/assets/3a56aab5-05d9-4f9f-8735-40ba80666afa (last visited Jun. 1, 2026).

with "code obfuscation" that "[c]onceals the purpose of Irdeto secure library code, its logic and data." Again, these are the very features and capabilities of the technology claimed in the Asserted Patents.[25]

**Code obfuscation**

- Conceals the purpose of Irdeto secure library code, its logic and data.
- Prevents tampering and significantly hinders reverse engineering.

**Integrity verification**

- Checks the integrity of signed applications.
- Detects tampering by attackers.
- Checks the code prior to loading as well as during run time.

40. In 2023, Irdeto relaunched its ActiveCloak for Media, which provides "source code obfuscation, anti-debugging and integrity verification to harden software DRM technology that is embedded into a video streaming application providing protection with integrated renewability and security diversification."[26] In other words, ActiveCloak is another implementation of the self-checking, obfuscation, integrity verification technology claimed in the Asserted Patents and directed to video streaming applications.

41. These Irdeto security tools—including but not limited to Denuvo, Irdeto Video Entertainment Protection, Cloakware, and ActiveCloak—are collectively the "Accused Instrumentalities."[27]

---

[25] *API Protection for PSPs for Web and Mobile Applications*, *supra* note 24.

[26] *Irdeto Launches Renewed Irdeto ActiveCloak for Media*, Irdeto (Feb. 7, 2023) https://irdeto.com/news/irdeto-launches-renewed-irdeto-activecloak-for-media.

[27] Throughout this Complaint, if an exemplary product is discussed, it should be understood that the accusation against such exemplary product apply equally to all of Irdeto's Accused

42. By making, using, offering to sell, selling, and/or importing the Accused Instrumentalities to customers in the United States and providing those customers with the means to integrate the patented self-checking, obfuscation, integrity verification technology into their programs, Irdeto has infringed and is infringing the Asserted Patents, as described in further detail below.

**Causes of Action**

**Count I: Infringement of U.S. Patent No. 7,581,103**

43. All preceding factual allegations above are incorporated as if fully set forth herein.

44. The USPTO duly and legally issued the '103 Patent, entitled "Software Self-Checking Systems and Methods." All rights, title, and interest in the '103 Patent have been assigned to ITP.

45. The '103 Patent is valid, enforceable, and was duly issued in full compliance with Title 35 of the United States Code.

46. Claim 15 of the '103 Patent[28] recites:

A self-checking program stored in a non-volatile memory, the program comprising:

> a first code sequence configured to perform a first integrity check on a first portion of the program while the program is running;
>
> a first corrector contained within the first portion of the program, the first corrector being assigned a value such that computation of a first hash function results in a first predefined value when the first portion of the program has not been improperly modified;
>
> a second code sequence configured to perform a second integrity check on a second portion of the program while the program is running;

---

Instrumentalities as defined herein, as well as any additional software security tools that incorporate substantially similar functionality, to the extent there are any such additional tools.

[28] Claim 15 is representative. Plaintiff reserves the right to identify additional infringed claims, and further detail Irdeto's infringement in its Infringement Contentions at the time required under this Court's scheduling order.

> wherein the first portion of the program and the second portion of the program overlap at least in part, and wherein the integrity of the first code sequence is checked by at least one code sequence and the integrity of the second code sequence is checked by at least one code sequence.

47. Third parties, including program developers who are customers of Irdeto in the United States and in Texas, such as Gearbox Software and other customers in Texas, have directly infringed the '103 Patent using the Accused Instrumentalities to create, distribute, and execute self-checking programs that practice the '103 Patent. Each time an Irdeto customer uses the Accused Instrumentalities to build a protected program, the resulting program includes checks that, when executed, perform the operations claimed in the '103 Patent. These protected programs are distributed to and executed by end users in the United States, infringing at least Claim 15 of the '103 Patent.

48. Irdeto has induced infringement of the '103 Patent by third parties in violation of 35 U.S.C. § 271(b). Irdeto has actively induced infringement of the '103 Patent by intentionally encouraging, instructing, and facilitating the use of Accused Instrumentalities by its customers—including programmer developers in the United States—to create self-checking programs that practice the claimed invention of the '103 Patent.[29] For example, Irdeto markets itself as "[e]asy to integrate," "[p]lug-and-protect in minutes" and that its "engineers will inject the protection into the optimal place and set it up for you."[30]

---

[29] *See*, *e.g.*, *Video Game Security Solutions*, Irdeto, https://irdeto.com/video-games (last visited Jun. 1, 2026); *Video Game Anti-Piracy*, Irdeto, https://irdeto.com/video-games/denuvo-anti-piracy/video-game-anti-piracy (last visited Jun. 1, 2026); *Anti-Tamper*, *supra* note 22; *Keeping the Fight Fair—Busting Myths Around Denuvo Anti-Cheat*, Irdeto (July 23, 2020) https://irdeto.com/blog/busting-myths-around-denuvo-anti-cheat; Andreas Ullmann, *Performance-Aware Anti-Piracy Integration: Three Principles for Placement and Execution*, Irdeto (April 7, 2026) https://irdeto.com/blog/anti-piracy-integration-performance; *Anti-Piracy*, Denuvo by Irdeto, https://irdeto.com/hubfs/resources/data-sheets/denuvo-anti-piracy-one-pager.pdf (last visited Jun. 1, 2026); *Protect Your Game Against Piracy from Day One*, Irdeto, https://irdeto.com/fight-piracy-with-denuvo-anti-tamper (last visited Jun. 1, 2026).

[30] *Anti-Piracy*, *supra* note 29; *Protect Your Game Against Piracy from Day One*, *supra* note 29.

49. The Accused Instrumentalities enable third parties to create the infringing self-checking programs that are stored in a non-volatile memory and distributed to end users.

50. Programs protected by the Accused Instrumentalities are self-checking programs as claimed in the ’103 Patent. For example, Denuvo includes a series of self-checking capabilities, including “system integrity checks,” “active anti-tamper,” and “code integrity checks,” and is marketed as providing self-checking-based defenses, including defenses against “code injection and unauthorized module loading” and “validat[ing] code and data at startup and runtime.”[31]




51. Programs protected by the Accused Instrumentalities include a first code sequence configured to perform a first integrity check on a first portion of the program. By way of example,

---

[31] *Anti-Tamper*, *supra* note 22; *see also* Connor Jay, *Denuvo Analysis*, Connor-Jay’s Blog (Jan. 21, 2025) https://connorjaydunn.github.io/blog/posts/denuvo-analysis/.

Denuvo's "code integrity checks," "user integrity checks," "integrity verification," and "active anti-tamper" include code sequences that are configured to perform integrity checks on portions of the program they cover, including by detecting manipulations, "verify[ing] the integrity of the system," and validating code.[32]

52. The first code sequence is configured to perform a first integrity check on a first portion of the program by performing a function and comparing the result to a predefined value. For example, Denuvo's "seemingly random .VM checks" "construct a constant" and use that constant "to perform calculations that would break given the constant changed."[33] The predefined value is the expected result when there has been no tampering or improper modification.

> **Code Integrity Checks**
>
> **Cyclic Redundancy Check (CRC)**
>
> **VM Handler CRC**
>
> As expected, Denuvo will perform scans of important handlers (e.g. CPUID, SYSCALL, etc), and maybe other code, to make sure there is no hooks / tampering going on. Unfortunately, that is all I have to say regarding those checks.
>
> **Seemingly Random .VM Check**
>
> Frequently, Denuvo will construct a constant via reading a seemingly random amount of bytes from the .VM section. This constant will then be used to perform calculations that would break given the constant changed. Take the following handler for instance:

53. Another example of Denuvo's user integrity checks is its "Pre-OEP checks" which perform a calculation on a portion of the program and compare the result against an expected value to "check if it is equal to what it should be."[34]

---

[32] *Anti-Tamper*, *supra* note 22; Jay, *supra* note 31.
[33] Jay, *supra* note 31.
[34] *Id.*

## User Integrity Checks

I will now highlight all of the vectors Denuvo use to verify the integrity of the system executing the protected binary. By the nature of the protection, at least one instance of each check must be sent to the server when requesting for a license file.

### Pre-OEP Checks

After reading the previous section(s), you may be wondering what happens if a user's hardware identification changes (e.g. Windows update, new CPU, etc). Denuvo account for this using special checks which execute just before handing control to the OEP. They will simply perform some constant decryptions but instead of using said constant to execute an instruction, they will check if it is equal to what it should be (these are the only checks that do this, everything else assumes that the decrypted constant is correct and acts accordingly). If the result is not as expected, Denuvo will delete the locally saved license file and request a new one from the Denuvo server; basically a repeat of the process described in The General Idea

54. These checks perform integrity checks on portions of the program while the program is running. For example, Denuvo's "integrity verification" "validates code and data at startup and runtime."[35]

55. Programs protected by the Accused Instrumentalities include a first corrector with an assigned value within the first portion of the program. When the program has not been improperly modified, running certain functions results in a pre-defined value. Denuvo, for example, operates in this way. In its set-up process, Denuvo first designates "certain functions . . . to become 'protected'" and modifies "select parts of certain instructions . . . from the binary." Then, during runtime, the integrity checks will detect if the program has been improperly modified.[36]

---

[35] *Anti-Tamper*, *supra* note 22.
[36] Jay, *supra* note 31.

# General Idea Revisited

## License File

When Denuvo is first added to a binary, certain functions in that game are selected to become "protected". All this means is that the function itself will be executed inside of a virtual machine, and select parts of certain instructions will be removed entirely from the binary. The license file is simply all of these removed bytes combined together and combined with the user's hardware identification via reversible mathematical functions. It is important that whatever operations are applied are reversible, otherwise the client would have no way of decrypting and getting the original constant.

## License DWORDs

Since there are multiple stolen instructions, prior to handling execution over to the OEP, Denuvo will write select parts of the license file into DWORDs, scattered around the .vm section (.vm being the PE section which contains the VM code). Each DWORD, we will nick "License DWORD", is effectively a single instruction that was removed from the binary, combined with the hardware identification information of the customer.

# Code Integrity Checks

## Cyclic Redundancy Check (CRC)

### VM Handler CRC

As expected, Denuvo will perform scans of important handlers (e.g. CPUID, SYSCALL, etc), and maybe other code, to make sure there is no hooks / tampering going on. Unfortunately, that is all I have to say regarding those checks.

### Seemingly Random .VM Check

Frequently, Denuvo will construct a constant via reading a seemingly random amount of bytes from the .VM section. This constant will then be used to perform calculations that would break given the constant changed. Take the following handler for instance:

```
mov edx, dword ptr ds:[rax+0x03] ; read next handler index

movsx r13, word ptr ds:[0x00000001467FEE8D] ; here we see Denuvo read a "random" word from the .VM co

add r13, 0xFFFFFFFFFFFFDBAB ; decrypt word

add rax,r13 ; update vip

mov qword ptr ds:[rcx+418],rax ; save vip

lea rax,qword ptr ds:[0x14E2FD140] ; mov address of handler table into rax

; compute next handler and jmp to it
mov r12,qword ptr ds:[rax+rdx*8]
xchg qword ptr ss:[rsp],r12
ret
```

If the user had placed a breakpoint, hook, or tampered with the word stored at *0x00000001467FEE8D* (which iirc, is a CPUID), then the VM would likely end up executing a random handler since the resulting value in R13 would differ; causing undefined behaviour.

56. Programs protected by the Accused Instrumentalities include a second code sequence configured to perform a second integrity check on a second portion of the program while the program is running.

57. The Accused Instrumentalities embed many integrity-check code sequences. Denuvo, for example, inserts multiple integrity checks throughout each protected program, each assigned to a different portion.[37] At least one of those many code sequences performs its integrity

---

[37] *Anti-Tamper*, *supra* note 22; Jay, *supra* note 31; *see also* RD945, *Resident.Evil.Requim.HYPERVISOR.V2-KIRIGIRI*, GitHub (Audit Date Mar. 4, 2026) https://github.com/RD945/hypervisor-crack-audit#3-how-denuvo-anti-tamper-works (showing

check on a different portion of the program from the first integrity check, while the program is running.[38]

> **General Idea Revisited**
>
> **License File**
>
> When Denuvo is first added to a binary, certain functions in that game are selected to become "protected". All this means is that the function itself will be executed inside of a virtual machine, and select parts of certain instructions will be removed entirely from the binary. The license file is simply all of these removed bytes combined together and combined with the user's hardware identification via reversible mathematical functions. It is important that whatever operations are applied are reversible, otherwise the client would have no way of decrypting and getting the original constant.

58. Because the Accused Instrumentalities deploy many such code sequences, including ones that perform cyclic redundancy checks, across each protected program, the portions of the program checked by those code sequences overlap at least in part.[39] This is especially so because Denuvo, for example, embeds "hundreds of trigger points scattered through the game, not a single check."[40] That overlap is further evidenced by one of Denuvo's core defensive properties—code self-verification—that "patching one check triggers integrity failures in others."[41]

59. The integrity of the first code sequence is checked by at least one code sequence, and the integrity of the second code sequence is checked by at least one code sequence. By way of example, Denuvo's "CRC/hash checks over its own memory regions" to see "[h]as Denuvo's own code been patched?"[42]

---

that Denuvo has self-integrity checks, contains hundreds of trigger points, and that the code self-verifies).

[38] *Anti-Tamper*, *supra* note 22.

[39] Jay, *supra* note 31; *Anti-Tamper*, *supra* note 22; RD945, *supra* note 37.

[40] RD945, *supra* note 37.

[41] *Id.*

[42] *Id.*

| | | |
|---|---|---|
| Self-integrity | Has Denuvo's own code been patched? | CRC/hash checks over its own memory regions |

60. Moreover, Denuvo's VM Handler CRC "will perform scans of important handlers (*e.g.*, CPUID, SYSCALL, etc.), and maybe other code, to make sure there is no hooks / tampering going on."[43]

> **Code Integrity Checks**
>
> **Cyclic Redundancy Check (CRC)**
>
> **VM Handler CRC**
>
> As expected, Denuvo will perform scans of important handlers (e.g. CPUID, SYSCALL, etc), and maybe other code, to make sure there is no hooks / tampering going on. Unfortunately, that is all I have to say regarding those checks.

61. Irdeto directly infringes the '103 Patent through its own operation of the programs protected by the Accused Instrumentalities, which meet every element of at least exemplary Claim 15 as set forth above, including during testing of its products and provision of services.

62. Irdeto knew of the '103 patent and knew of its infringement at least because Irdeto became aware of ITP's software self-checking systems and methods patent family during prosecution in 2014, when the PTO Examiner specifically cited InterTrust's U.S. Patent Application Pub. No. 2010/0017620 ("'620 Application") as a prior art reference to one of Irdeto's own patent applications (Application No. 13/583,965). This Intertrust '620 Application, which Irdeto learned of since at least 2014, enumerates the '103 Patent on its face.

63. Irdeto knew of the '103 Patent and knew that its customers' use of the Accused Instrumentalities would constitute infringement of the '103 Patent, or it was willfully blind to such

[43] Jay, *supra* note 31.

infringement. Irdeto knew that the Accused Instrumentalities are specifically designed to produce self-checking programs like the innovations claimed in the '103 Patent.

64. Irdeto specifically intended to induce infringement of the '103 Patent. As discussed above, Irdeto markets itself as "[e]asy to integrate," "[p]lug-and-protect in minutes" and that its "engineers will inject the protection into the optimal place and set it up for you."[44] Irdeto provides its customers with detailed documentation and technical support directing them to use the Accused Instrumentalities in a manner that produces infringing programs. For example, Irdeto publishes blog posts, product documentation, and marketing materials that describe and encourage the use of the Accused Instrumentalities.[45] Irdeto's documentation instructs customers to integrate these features into their programs, and Irdeto's products are designed so that these infringing features are automatically embedded into the customer's program when the Accused Instrumentalities are used as directed.

65. Irdeto's direct and induced infringement have been without license from ITP, and Irdeto's acts have damaged ITP. ITP is entitled to recover the damages it has sustained as a result of Irdeto's wrongful acts in an amount subject to proof at trial.

66. Irdeto's direct and induced infringement of ITP's '103 Patent have been willful.

**Count II: Infringement of U.S. Patent 7,823,135**

67. All preceding allegations are incorporated as if fully set forth herein.

---

[44] *Anti-Piracy*, *supra* note 29; *Protect Your Game Against Piracy from Day One*, *supra* note 29.

[45] *See, e.g.*, *Video Game Security Solutions*, *supra* note 29; *Video Game Anti-Piracy*, *supra* note 29; *Anti-Tamper*, *supra* note 22; *Keeping the Fight Fair—Busting Myths Around Denuvo Anti-Cheat*, *supra* note 29; Ullmann, *supra* note 29; *Anti-Piracy*, *supra* note 29; *Protect Your Game Against Piracy from Day One*, *supra* note 29.

68. The USPTO duly and legally issued the ’135 Patent, entitled “Software Self-Defense Systems and Methods.” All rights, title, and interest in the ’135 Patent have been assigned to ITP.

69. The ’135 Patent is valid, enforceable, and was duly issued in full compliance with Title 35 of the United States Code.

70. Irdeto has directly infringed the ’135 Patent. The infringing acts include, but are not limited to, the manufacture, use, sale, importation, and/or offer for sale of the Accused Instrumentalities to practice the claimed invention in the ’135 Patent. For example, Claim 1 of the ’135 Patent[46] recites:

> A method for obfuscating a computer program, the computer program containing a sequence of programming instructions, the method including:
>
> > incorporating one or more programming constructs into the computer program, the programming constructs being operable to designate one or more memory locations for storage of data, and wherein the one or more memory locations are logically located between a first memory location and a second memory location, the first memory location containing at least part of a programming instruction from the sequence of programming instructions, and the second memory location containing at least part of a programming instruction from the sequence of programming instructions;
> >
> > incorporating one or more memory allocation statements into the computer program, the memory allocation statements being operable to allocate memory for storage of data, and wherein at least a portion of the memory allocated for storage of data includes one or more of the memory locations designated by the programming constructs for storage of data;
> >
> > storing data within the memory allocated for storage of data,

---

[46] Claim 1 is representative. Plaintiff reserves the right to identify additional infringed claims, and further detail Irdeto’s infringement in its Infringement Contentions at the time required under this Court’s scheduling order.

whereby the distinction between an area of memory primarily containing programming instructions and an area of memory primarily containing data is at least somewhat obscured.

71. The Accused Instrumentalities perform methods for obfuscating a computer program containing a sequence of programming instructions, meeting the elements of Claim 1. For example, Denuvo is marketed as embodying "state of the art obfuscation."[47] One such obfuscation technique is to avoid "stor[ing] values in contiguous memory" but instead "stor[ing] . . . with bytes / bits scattered everywhere."[48]

> The Denuvo Anti-Cheat technology includes key security features such as integrity verification, protection against static and dynamic analysis and state of the art obfuscation to ensure maximum protection against cheaters and hackers. It is also fine-tuned to each individual game title to ensure there is no performance impact while guaranteeing no false positives and maximum detection.

> **Misc**
>
> **Virtual Machine (VM)**
>
> I don't know much about the virtual machine. I believe there are different types. It seems simple at times (e.g. handler table, no rolling key, etc). Perhaps in a future blog post I will discuss it? If anyone would like to chat about it, feel free to contact me ;).
>
> **Bit Vector**
>
> Probably my favourite thing about Denuvo is that unlike traditional VMs (e.g. VMP and Themida), Denuvo doesn't store values in contiguous memory. Instead, they decide to store things like register values with their bytes / bits scattered everywhere. This makes it incredibly difficult to see what is going on, especially when operations are being performed on said values. This is probably the best example I can provide of Denuvo writing a value bit by bit:

---

[47] *Zero Hour Safer as M7 Productions Deploys Denuvo Anti-Cheat,* Irdeto (May 24, 2022) https://irdeto.com/news/zero-hour-becomes-safer-as-m7-productions-deploys-denuvo-anti-cheat.
[48] Jay, *supra* note 31.

72. The Accused Instrumentalities incorporate programming constructs operable to designate one or more memory locations for storage of data. By way of example, the designated data storage locations are the "slots" which Denuvo "distributes the secret DWORDs into" and "scatter[s] the resulting table across."[49]

The key point is that before the OEP, the license check differs in two fundamental ways from protection code that only verifies the license after execution has "passed the OEP stop on the green line," so to speak:

- LIC_CHECK decrypts and distributes the secret DWORDs into their proper slots for triggers that fire after the OEP (Original Entry Point).
- It also performs an integrity check of the entire table of 214 DWORDs.

Time for a little surprise. Let's start stepping and work our way through the LIC_CHECK procedure toward the OEP (Original Entry Point).

- Read dbdata.dll and verify its watermark. This library builds the request code; its substitution was already demonstrated in the "Tiberium Reversing: Chasing the Denuvo Crack" research (see the video linked in the "WWW" section).

- Read the license file 1031469.dlf at: %ProgramData%\Electronic Arts\EA Services\License. Extract ContentId and make sure it equals 1031469. Extract GameToken, decrypt it, XOR it with constants, then scatter the resulting table across the section into strictly defined slots located past the RET of the game's main procedures.

- Out of forty VMProtect 2 contexts, only one is thrown at the LIC_CHECK protection. It can't stand up to our analyzer; we just monitor and patch it when needed. VM_EXIT == 0x1418f3843. The handler with the _READ_DS_DWORD macro, which among other things reads data from the secret table, is at 0x141917511.

- After Denuvo gathers and processes data from all four blocks, it builds a license matrix which, by using timing (RDTSC), looks pseudo-random each run. You can see it on the stack at offset +0x4A0 if you break on one of the static cpuid calls before the overall check.

- The decisive check. If the secret table is valid, it jumps to the WinAPI VirtualAlloc and then to the OEP. If not, after some shuffling it calls the WinAPI DeleteFileA on the failed license. Funny detail: before deleting the license, Denuvo calls that WinAPI with the argument C:\—i.e., it literally tries to delete drive C:. Naturally it fails with an error and nothing gets removed, but it leaves a weird aftertaste.

73. These designated memory locations for stored data are located between two separate memory locations, each containing at least part of a programming instruction. By way of example, the "slots" are "located past the RET of the game's main procedures"—the RET being a programming instruction.[50] As a further example, the license data is "scattered around the .vm section," which "contains the VM code." [51]

---

[49] Elf, *Denuvo War Stories: How EA Origin's Unbreakable DRM was Cracked*, HackMag (Nov. 16, 2025) https://hackmag.com/security/denuvo.
[50] *Id.*
[51] Jay, *supra* note 31.

**License DWORDs**

Since there are multiple stolen instructions, prior to handling execution over to the OEP, Denuvo will write select parts of the license file into DWORDs, scattered around the .vm section (.vm being the PE section which contains the VM code). Each DWORD, we will nick "License DWORD", is effectively a single instruction that was removed from the binary, combined with the hardware identification information of the customer.

74. The Accused Instrumentalities practice the claimed allocation and storage features by incorporating memory allocation statements operable to allocate memory for storage of data, where at least a portion of the allocated memory includes one or more of the designated memory identified above. The Accused Instrumentalities further store data within the memory allocated for storage of data. For example, after Denuvo "scatter[s] the resulting table . . . into strictly defined slots," it verifies that "the secret table is valid," and then "jumps to the WinAPI VirtualAlloc and then to the OEP."[52] The secret DWORDs are ultimately decrypted and distributed "into their proper slots for triggers that fire after the OEP (Original Entry Point)."[53]

The key point is that before the OEP, the license check differs in two fundamental ways from protection code that only verifies the license after execution has "passed the OEP stop on the green line," so to speak:

- LIC_CHECK decrypts and distributes the secret DWORDs into their proper slots for triggers that fire after the OEP (Original Entry Point).
- It also performs an integrity check of the entire table of 214 DWORDs.

Time for a little surprise. Let's start stepping and work our way through the LIC_CHECK procedure toward the OEP (Original Entry Point).

- Read dbdata.dll and verify its watermark. This library builds the request code; its substitution was already demonstrated in the "Tiberium Reversing: Chasing the Denuvo Crack" research (see the video linked in the "WWW" section).
- Read the license file 1031469.dlf at: %ProgramData%\Electronic Arts\EA Services\License. Extract ContentId and make sure it equals 1031469. Extract GameToken, decrypt it, XOR it with constants, then scatter the resulting table across the section into strictly defined slots located past the RET of the game's main procedures.
- Out of forty VMProtect 2 contexts, only one is thrown at the LIC_CHECK protection. It can't stand up to our analyzer; we just monitor and patch it when needed. VM_EXIT == 0x1418f3843. The handler with the _READ_DS_DWORD macro, which among other things reads data from the secret table, is at 0x141917511.
- After Denuvo gathers and processes data from all four blocks, it builds a license matrix which, by using timing (RDTSC), looks pseudo-random each run. You can see it on the stack at offset +0x4A0 if you break on one of the static cpuid calls before the overall check.
- The decisive check. If the secret table is valid, it jumps to the WinAPI VirtualAlloc and then to the OEP. If not, after some shuffling it calls the WinAPI DeleteFileA on the failed license. Funny detail: before deleting the license, Denuvo calls that WinAPI with the argument C:\—i.e., it literally tries to delete drive C:. Naturally it fails with an error and nothing gets removed, but it leaves a weird aftertaste.

---

[52] Elf, *supra* note 49.
[53] *Id.*

75. By so designating, allocating, and storing data between programming instructions, the Accused Instrumentalities obscure the distinction between an area primarily containing programming instructions and an area primarily containing data. For example, Denuvo "store[s] things . . . with their bytes / bits scattered everywhere," resulting in a protected program that is "extremely obfuscated and illegible."[54] As a further example, Denuvo creates an obfuscated protected program by "scatter[ing] the resulting table . . . into strictly defined slots located past the RET of the game's main procedures," and by "distribut[ing] the secret DWORDs into their proper slots."[55]

76. Irdeto directly infringed the '135 Patent through its own operation of the programs protected by the Accused Instrumentalities, which meet every element of exemplary Claim 1 as set forth above, including during testing of its products and provision of services.

77. Irdeto knew of the '135 Patent and knew of its infringement at least because Irdeto had learned of ITP's software self-defense systems and methods patent family no later than 2014, when Irdeto's own U.S. Patent No. 8,752,032 issued and listed as a cited reference U.S. Patent No. 7,779,394 ("'394 Patent"). This '394 Patent, which Irdeto knew about since at least 2014, is a divisional of U.S. Patent Application Ser. No. 09/629,546 ("'546 Application") and claims priority to U.S. Provisional Patent Application Ser. No. 60/146,419 ("'419 Application"), and lists both the '546 Application and the '419 Application on its face. The '135 Patent had issued within two months of the '394 Patent, in this same software self-defense systems and methods patent family, also as a divisional of the '546 Application, and also claims priority to the '419 Application.

---

[54] Jay, *supra* note 31.
[55] Elf, *supra* note 49.

78. Irdeto committed the infringing activities without license from ITP. Irdeto's acts of infringement have damaged ITP, as owner of the '135 Patent. ITP is entitled to recover the damages it has sustained as a result of Irdeto's wrongful acts in an amount subject to proof at trial.

79. Irdeto's infringement of ITP's '135 Patent has been willful.

**Count III: Infringement of U.S. Patent No. 8,001,388**

80. All preceding factual allegations above are incorporated as if fully set forth herein.

81. The USPTO duly and legally issued the '388 Patent, entitled "Software Self-Checking Systems and Methods." All rights, title, and interest in the '388 Patent have been assigned to ITP.

82. The '388 Patent is valid, enforceable, and was duly issued in full compliance with Title 35 of the United States Code.

83. Claim 13 of the '388 Patent[56] recites:

> A non-transitory computer-readable medium storing instructions that, when executed by a processor, are configured to cause the processor to perform a method including:
>
>> calculating, utilizing a self-checking code sequence assigned to a first portion of a plurality of overlapping portions of a program, a function of the first portion, said portion containing a corrector having an assigned value chosen such that the function calculated by the self-checking code sequence results in a predefined value when the portion has not been improperly modified; and
>>
>> triggering a tamper response mechanism if the functioned calculated by the self-checking code sequence does not result in the predefined value.

84. Third parties, including program developers who are customers of Irdeto in the United States and in Texas, such as Gearbox Software and other customers in Texas, have directly

---

[56] Claim 13 is representative. Plaintiff reserves the right to identify additional infringed claims, and further detail Irdeto's infringement in its Infringement Contentions at the time required under this Court's scheduling order.

infringed the '388 Patent using the Accused Instrumentalities to create, distribute, and execute self-checking programs that practice the claimed invention of the '388 Patent. Each time an Irdeto customer uses the Accused Instrumentalities to build a protected program, the resulting program includes functionality checks that, when executed, perform the operations claimed in the '388 Patent. These protected programs are distributed to and executed by end users in the United States, infringing at least Claim 13 of the '388 Patent.

85. Irdeto has induced infringement of the '388 Patent by third parties in violation of 35 U.S.C. § 271(b). Irdeto has actively induced infringement of the '388 Patent by intentionally encouraging, instructing, and facilitating the use of Denuvo, Irdeto video entertainment protection, Cloakware, and ActiveCloak by its customers—including programmer developers in the United States—to create self-checking programs that practice the claimed invention of the '388 Patent.[57] For example, Irdeto markets itself as "[e]asy to integrate," "[p]lug-and-protect in minutes" and that its "engineers will inject the protection into the optimal place and set it up for you."[58]

86. Programs protected by the Accused Instrumentalities include self-checking codes assigned to portions of protected programs. For example, Denuvo includes a series of self-checking capabilities, including "system integrity checks," "active anti-tamper," and "code integrity checks," and is marketed as providing self-checking based defenses, including defenses against "code injection and unauthorized module loading" and "validat[ing] code and data at startup and runtime."[59]

---

[57] *See, e.g.*, *Video Game Security Solutions*, *supra* note 29; *Video Game Anti-Piracy*, *supra* note 29; *Anti-Tamper*, *supra* note 22; *Keeping the Fight Fair—Busting Myths Around Denuvo Anti-Cheat*, *supra* note 29; Ullmann, *supra* note 29; *Anti-Piracy*, *supra* note 29; *Protect Your Game Against Piracy from Day One*, *supra* note 29.
[58] *Anti-Piracy*, *supra* note 29; *Protect Your Game Against Piracy from Day One*, *supra* note 29.
[59] *Anti-Tamper*, *supra* note 22; Jay, *supra* note 31.

87. Moreover, the Accused Instrumentalities embed multiple checks—including code integrity checks, user integrity checks, cyclic redundancy checks, and seemingly random .VM checks—throughout each program. Because the Accused Instrumentalities deploy many such code sequences, including ones that perform cyclic redundancy checks, across each protected program, with hundreds of trigger points and self-verification capability, the portions of the program checked overlap, at least in part.[60]

88. These checks are possible because, for example, Denuvo designates "certain functions" as "protected" and modifies "select parts of certain instructions . . . from the binary." Then, during runtime, the integrity checks "would break given the constant changed" if the program has been improperly modified.[61]

89. Utilizing the self-checking code sequences, programs protected by the Accused Instrumentalities calculate a function and compare that function to a pre-defined value. For example, Denuvo's "seemingly random .VM checks" "construct a constant," which is used "to perform calculations that would break given the constant changed."[62] The predefined value is the expected result when the program has not been improperly modified.

90. As another example, Denuvo's "Pre-OEP checks," a form of "user integrity check," perform a calculation on a portion of the program and compare the result against an expected value to "check if it is equal to what it should be."[63] The predefined value is expected when the program has not been improperly modified. When the function yields a value different from the expected result, a tamper response mechanism is triggered.[64]

---

[60] *Anti-Tamper*, *supra* note 22; Jay, *supra* note 31; RD945, *supra* note 37.
[61] Jay, *supra* note 31.
[62] *Id.*
[63] *Id.*
[64] *Id.*

# Code Integrity Checks

## Cyclic Redundancy Check (CRC)

### VM Handler CRC

As expected, Denuvo will perform scans of important handlers (e.g. CPUID, SYSCALL, etc), and maybe other code, to make sure there is no hooks / tampering going on. Unfortunately, that is all I have to say regarding those checks.

### Seemingly Random .VM Check

Frequently, Denuvo will construct a constant via reading a seemingly random amount of bytes from the .VM section. This constant will then be used to perform calculations that would break given the constant changed. Take the following handler for instance:

```
mov edx, dword ptr ds:[rax+0x03] ; read next handler index

movsx r13, word ptr ds:[0x00000001467FEE8D] ; here we see Denuvo read a "random" word from the .VM coo

add r13, 0xFFFFFFFFFFFFDBAB ; decrypt word

add rax,r13 ; update vip

mov qword ptr ds:[rcx+418],rax ; save vip

lea rax,qword ptr ds:[0x14E2FD140] ; mov address of handler table into rax

; compute next handler and jmp to it
mov r12,qword ptr ds:[rax+rdx*8]
xchg qword ptr ss:[rsp],r12
ret
```

If the user had placed a breakpoint, hook, or tampered with the word stored at *0x00000001467FEE8D* (which iirc, is a CPUID), then the VM would likely end up executing a random handler since the resulting value in R13 would differ; causing undefined behaviour.

91. The triggered response includes, without limitation, monitoring, logging, reporting and engaging defensive mechanisms, as well as any other functionalities offering comparable safeguards.[65]

[65] *Id.*; *Denuvo in Games: What You Need to Know*, Free Minds (Dec. 4, 2025) https://nation.steveharveyfm.com/free-minds/denuvo-in-games-what-you-need-to-know-1764798031.

4/29/26, 11:54 AM Denuvo In Games: What You Need To Know

running. These checks look for any unauthorized modifications or tampering. If anything suspicious is detected, the game may shut down or malfunction, rendering the pirated version unplayable.

## User Integrity Checks

I will now highlight all of the vectors Denuvo use to verify the integrity of the system executing the protected binary. By the nature of the protection, at least one instance of each check must be sent to the server when requesting for a license file.

### Pre-OEP Checks

After reading the previous section(s), you may be wondering what happens if a user's hardware identification changes (e.g. Windows update, new CPU, etc). Denuvo account for this using special checks which execute just before handing control to the OEP. They will simply perform some constant decryptions but instead of using said constant to execute an instruction, they will check if it is equal to what it should be (these are the only checks that do this, everything else assumes that the decrypted constant is correct and acts accordingly). If the result is not as expected, Denuvo will delete the locally saved license file and request a new one from the Denuvo server; basically a repeat of the process described in The General Idea

92. Irdeto has directly infringed the '388 Patent through its own operation of the programs protected by the Accused Instrumentalities, which meet every element of exemplary Claim 13 as set forth above, including during testing of its products and provision of services.

93. Irdeto knew of the '388 patent and knew of its infringement at least because Irdeto became aware of ITP's software self-checking systems and methods patent family during prosecution in 2014, when the PTO Examiner specifically cited Intertrust's '620 Application as a prior art reference to one of Irdeto's own patent applications (Application No. 13/583,965). This Intertrust '620 Application, which Irdeto learned of by at least 2014, issued as the '388 Patent.

94. Irdeto knew of the '388 Patent and knew that its customers' use of the Accused Instrumentalities would constitute infringement of the '388 Patent, or it was willfully blind to such infringement. Irdeto knew that the Accused Instrumentalities are specifically designed to produce self-checking programs that practice the method claimed in the '388 Patent.

95. Irdeto specifically intended to induce infringement of the ’388 Patent. As discussed above, Irdeto markets itself as “[e]asy to integrate,” “[p]lug-and-protect in minutes” and that its “engineers will inject the protection into the optimal place and set it up for you.”[66] Irdeto provides its customers with detailed instructions, documentation, tutorials, and technical support directing them to use the Accused Instrumentalities in a manner that produces infringing programs. For example, Irdeto publishes blog posts, product documentation, and marketing materials that describe and encourage the use of the Accused Instrumentalities, which practices the very functionalities claimed in the ’388 Patent.[67] Irdeto’s documentation instructs customers to integrate these features into their programs, and Irdeto’s products are designed so that these infringing features are automatically embedded into the customer’s program when the Accused Instrumentalities are used as directed.

96. Irdeto’s direct and induced infringement have been without license from ITP. Irdeto’s acts of infringement have damaged ITP, as owner of the ’388 Patent. ITP is entitled to recover the damages it has sustained as a result of Irdeto’s wrongful acts in an amount subject to proof at trial.

97. Irdeto’s direct and induced infringement of ITP’s ’388 Patent have been willful.

**Count IV: Infringement of U.S. Patent 8,352,747**

98. All preceding allegations are incorporated as if fully set forth herein.

---

[66] *Anti-Piracy*, *supra* note 29; *Protect Your Game Against Piracy from Day One*, *supra* note 29.
[67] *See, e.g.*, *Video Game Security Solutions*, *supra* note 29; *Video Game Anti-Piracy*, *supra* note 29; *Anti-Tamper*, *supra* note 22; *Keeping the Fight Fair—Busting Myths Around Denuvo Anti-Cheat*, *supra* note 29; Ullmann, *supra* note 29; *Anti-Piracy*, *supra* note 29; *Protect Your Game Against Piracy from Day One*, *supra* note 29.

99. On January 8, 2013, the United States Patent and Trademark Office duly and legally issued the ’747 Patent, entitled “Software Self-Checking Systems and Methods.” All rights, title, and interest in the ’747 Patent have been assigned to ITP.

100. The ’747 Patent is valid, enforceable, and was duly issued in full compliance with Title 35 of the United States Code.

101. Irdeto has directly infringed the ’747 Patent. The infringing acts include, but are not limited to, the manufacture, use, sale, importation, and/or offer for sale of the Accused Instrumentalities to practice the claimed invention in the ’747 Patent. For example, Claim 1 of the ’747 Patent[68] recites:

> A method of creating a self-checking software program on a non-transitory computer-readable medium, the method comprising:
>
> > creating a plurality of self-checking code sequences operable to calculate a function of a portion of the program, each self-checking code sequence having an interval start field and an interval end field;
> >
> > inserting the plurality of self-checking code sequences into the program source code;
> >
> > inserting a plurality of correctors, each having a corrector value field, into the program executable;
> >
> > assigning the self-checking code sequences to portions of the program, each of the portions containing at least one corrector;
> >
> > locating the self-checking code sequences and setting the interval start field and the interval end field to values corresponding to the start of the portion of the program and the end of the portion of the program, respectively;
> >
> > locating the correctors and setting the corrector value field of each such that the function calculated by the self-checking code sequence results in a

---

[68] Claim 1 is representative. Plaintiff reserves the right to identify additional infringed claims, and further detail Irdeto’s infringement in its Infringement Contentions at the time required under this Court’s scheduling order.

predefined value when the portion of the program has not been improperly modified; and

writing the self-checking software program onto a non-transitory computer-readable medium.

102. The Accused Instrumentalities perform methods of creating self-checking software programs on non-transitory computer-readable media, meeting the elements of Claim 1.

103. The Accused Instrumentalities create self-checking code sequences in the source code of the program. For example, Denuvo's "code integrity checks," "user integrity checks," "integrity verification," and "active anti-tamper" include code sequences that detect tampering, verify system integrity, and validate code.[69]

104. Moreover, Denuvo's "seemingly random .VM checks" "construct a constant" and use that "constant [] to perform calculations that would break given the constant changed."[70] As another example, Denuvo's "Pre-OEP checks," a form of "user integrity check," perform a calculation on a portion of the program and compare the result against an expected value to "check if it is equal to what it should be." The pre-defined value is the expected result when the program has not been improperly modified.[71] Each of these integrity checks operates over a specific, bounded region of code, not the entire program.[72]

105. The Accused Instrumentalities work by embedding the self-checking codes into the protected program's source code.[73]

---

[69] *Anti-Tamper*, *supra* note 22; Jay, *supra* note 31.
[70] Jay, *supra* note 31.
[71] *Id.*
[72] *Id.*
[73] *Cloakware Software Protection by Irdeto*, *supra* note 24; *see also*, Robert Briel, *Irdeto Acquires Gaming Security Company Denuvo*, BroadBandTV News (Jan. 23, 2018) https://www.broadbandtvnews.com/2018/01/23/irdeto-acquires-gaming-security-company-denuvo/ (showing Denuvo incorporates Cloakware).

> Cloakware® Software Protection is a suite of advanced technologies, libraries and tools that enable the users to customize the protection of their critical digital assets such as keys, code and data. The solution provides application protection through sophisticated data, function and control flow transformations, anti-debug, whitebox cryptography, and active integrity verification. It integrates these security techniques into the customer's software build process, thereby embedding application protection directly at the source code level.
>
> Once applied, Cloakware® Software Protection ensure that applications can be safely deployed on untrusted hosts or in hostile environments. Applications are defended against tampering, reverse engineering, data exfiltration, code lifting and cloning.
>
> Cloakware® Software Protection integrates these security technologies into the customer's software build process directly, working at the source-level, with complementary, platform-specific, binary protections as well, to ensure the highest level of software protection is achieved with no compromise to ease of use and quick deployment.

106. The Accused Instrumentalities insert a plurality of correctors, each having a corrector value field, into the program executable. For example, each corrector has a corrector value field which stores the specific value assigned to achieve the predefined integrity-check result.

107. By way of example, Denuvo's integrity checks operate in this way. In its set-up process, Denuvo first designates "certain functions" as "protected" and modifies "select parts of certain instructions . . . from the binary." Then, if the program has been improperly modified, the calculation for the integrity checks "would break given the constant changed."[74] Each portion of the code contains at least one corrector, and each check is responsible for a defined region of the code. The parameters of the checks are set during the build process, when the Accused Instrumentality is applied to the protected program.

[74] Jay, *supra* note 31.

108. Irdeto has directly infringed the '747 Patent through its own operation of the programs protected by the Accused Instrumentalities, which meet every element of exemplary Claim 1 as set forth above, including during testing of its products and provision of services.

109. Irdeto knew of the '747 patent and knew of its infringement at least because Irdeto became aware of ITP's software self-checking systems and methods patent family during prosecution in 2014, when the PTO Examiner specifically cited InterTrust's '620 Application as a prior art reference to one of Irdeto's own patent applications (Application No. 13/583,965). This Intertrust '620 Application, which Irdeto learned of by at least 2014, references both the provisional application (No. 60/297,451) and non-provisional application (No. 10/172,682) from which the remaining Asserted Patents in this software self-checking systems and methods patent family issued, including the '747 Patent.

110. Irdeto committed the infringing activities without license from ITP. Irdeto's acts of infringement have damaged ITP, as owner of the '747 Patent. ITP is entitled to recover the damages it has sustained as a result of Irdeto's wrongful acts in an amount subject to proof at trial.

111. Irdeto's infringement of ITP's '747 Patent has been willful.

**Count V: Infringement of U.S. Patent No. 8,713,326**

112. All preceding factual allegations are incorporated as if fully set forth herein.

113. On April 29, 2014, the United States Patent and Trademark Office duly and legally issued the '326 Patent, entitled "Software Self-Checking Systems and Methods." All rights, title, and interest in the '326 Patent have been assigned to ITP.

114. The '326 Patent is valid, enforceable, and was duly issued in full compliance with Title 35 of the United States Code.

115. Claim 8 of the ’326 Patent[75] recites:

> A self-checking program stored on a non-transitory computer-readable medium, the self-checking program comprising:
>
> > a plurality of self-checking code sequences, each self-checking code sequence being configured to calculate a function of a portion of the program; and
> >
> > one or more code sequences configured to trigger a tamper response mechanism when an improper modification of the program is detected by at least one of the plurality of self-checking code sequences.

116. Third parties, including program developers who are customers of Irdeto in the United States and in Texas, such as Gearbox Software and other customers in Texas, have directly infringed the ’326 Patent using the Accused Instrumentalities to create, distribute, and execute self-checking programs that practice the claimed invention of the ’326 Patent. Each time an Irdeto customer uses the Accused Instrumentalities to build a protected program, the resulting program, when executed, performs the operations claimed in the ’326 Patent.

117. These protected program binaries are distributed to and executed by end users in the United States, thereby infringing claim 8 of the ’326 Patent.

118. Irdeto has induced infringement of the ’326 Patent by third parties in violation of 35 U.S.C. § 271(b). Irdeto has actively induced infringement of the ’326 Patent by intentionally encouraging, instructing, and facilitating the use of the Accused Instrumentalities to its customers—including program developers in the United States—to create self-checking programs that practice the ’326 Patent.[76] For example, Irdeto markets itself as “[e]asy to integrate,” “[p]lug-

---

[75] Claim 8 is representative. Plaintiff reserves the right to identify additional infringed claims, and further detail Irdeto’s infringement in its Infringement Contentions at the time required under this Court’s scheduling order.

[76] *See*, *e.g.*, *Video Game Security Solutions*, *supra* note 29; *Video Game Anti-Piracy*, *supra* note 29; *Anti-Tamper*, *supra* note 22; *Keeping the Fight Fair—Busting Myths Around Denuvo Anti-*

and-protect in minutes" and that its "engineers will inject the protection into the optimal place and set it up for you."[77]

119. Denuvo, for example, produces Denuvo-protected video games, stored on a non-transitory computer-readable media.

120. Programs protected by the Accused Instrumentalities are self-checking programs. For example, Denuvo includes a series of self-checking capabilities, including "system integrity checks," "active anti-tamper," and "code integrity checks," and is marketed as providing self-checking-based defenses, including defenses against "code injection and unauthorized module loading" and "validat[ing] code and data at startup and runtime."[78]

121. Programs protected by the Accused Instrumentalities include a plurality of self-checking code sequences, each self-checking code sequence being configured to calculate a function of a portion of the program. The Accused Instrumentalities embed many self-checking code sequences into the protected programs. Denuvo, for example, inserts multiple code integrity checks and user integrity checks throughout each program, each assigned to a different portion of the program.[79]

122. Moreover, Denuvo's "seemingly random .VM checks" "construct a constant" and use that "constant [] to perform calculations that would break given the constant changed."[80] As another example, Denuvo's "Pre-OEP checks," a form of "user integrity check," perform a

---

*Cheat*, *supra* note 29; Ullmann, *supra* note 29; *Anti-Piracy*, *supra* note 29; *Protect Your Game Against Piracy from Day One*, *supra* note 29.

[77] *Anti-Piracy*, *supra* note 29; *Protect Your Game Against Piracy from Day One*, *supra* note 29.

[78] *Anti-Tamper*, *supra* note 22; Jay, *supra* note 31.

[79] *Anti-Tamper*, *supra* note 22; Jay, *supra* note 31; RD945, *supra* note 37.

[80] Jay, *supra* note 31.

calculation on a portion of the program and compare the result against an expected value to "check if it is equal to what it should be."[81]

123. In the programs protected by the Accused Instrumentalities, one or more code sequences are configured to trigger a tamper response mechanism when an improper modification of the program is detected. The triggered response includes, without limitation, monitoring, logging, reporting and engaging defensive mechanisms, as well as any other functionalities offering comparable safeguards.[82]

124. Irdeto has directly infringed the '326 Patent through its own operation of the programs protected by the Accused Instrumentalities, which meet every element of exemplary Claim 8 as set forth above, including during testing of its products and provision of services.

125. Irdeto knew of the '326 patent and knew of its infringement at least because Irdeto became aware of ITP's software self-checking systems and methods patent family during prosecution in 2014, when the PTO Examiner specifically cited InterTrust's '620 Application as a prior art reference to one of Irdeto's own patent applications (Application No. 13/583,965). This Intertrust '620 Application, which Irdeto learned of by at least 2014, references both the provisional application (No. 60/297,451) and non-provisional application (No. 10/172,682) from which the remaining Asserted Patents in this software self-checking systems and methods patent family issued, including the '326 Patent.

126. Irdeto knew of the '326 Patent and knew that its customers' use of the Accused Instrumentalities would constitute infringement of the '326 Patent, or was willfully blind to such

---

[81] *Id.*

[82] *Id.*; *Denuvo in Games: What You Need to Know*, *supra* note 65.

infringement. Irdeto knew that the Accused Instrumentalities are specifically designed to produce self-checking programs comprising the following claimed in the '326 Patent.

127. Irdeto specifically intended to induce infringement of the '326 Patent. As discussed above, Irdeto markets itself as "[e]asy to integrate," "[p]lug-and-protect in minutes" and that its "engineers will inject the protection into the optimal place and set it up for you."[83] Irdeto provides its customers with detailed instructions, documentation, tutorials, and technical support directing them to use the Accused Instrumentalities in a manner that produces infringing programs. For example, Irdeto publishes blog posts, product documentation, and marketing materials that describe and encourage the use of the Accused Instrumentalities—the very functionalities claimed in the '326 Patent.[84] Irdeto's documentation instructs customers to integrate these features into their programs, and Irdeto's products are designed so that these infringing features are automatically embedded into the customer's program when the Accused Instrumentalities are used as directed.

128. Irdeto's direct and induced infringement have been without license from ITP. Irdeto's acts of infringement have damaged ITP, as owner of the '326 Patent. ITP is entitled to recover the damages it has sustained as a result of Irdeto's wrongful acts in an amount subject to proof at trial.

129. Irdeto's direct and induced infringement of ITP's '326 Patent have been willful.

**Count VI: Infringement of U.S. Patent No. 9,141,788**

130. All preceding factual allegations above are incorporated as if fully set forth herein.

---

[83] *Anti-Piracy*, *supra* note 29; *Protect Your Game Against Piracy from Day One*, *supra* note 29.

[84] *See, e.g.*, *Video Game Security Solutions*, *supra* note 29; *Video Game Anti-Piracy*, *supra* note 29; *Anti-Tamper*, *supra* note 22; *Keeping the Fight Fair—Busting Myths Around Denuvo Anti-Cheat*, *supra* note 29; Ullmann, *supra* note 29; *Anti-Piracy*, *supra* note 29; *Protect Your Game Against Piracy from Day One*, *supra* note 29.

131. The United States Patent and Trademark Office duly and legally issued the ’788 Patent, entitled “Software Self-Checking Systems and Methods.” All rights, title, and interest in the ’788 Patent have been assigned to ITP.

132. The ’788 Patent is valid, enforceable, and was duly issued in full compliance with Title 35 of the United States Code.

133. Claim 1 of the ’788 Patent[85] recites:

> A non-transitory computer-readable storage medium, the computer-readable storage medium storing programming instructions that, if executed by a processor of a computer system, are operable to cause the computer system to perform operations comprising:
>
> > calculating, by a self-checking code sequence included in a program, during execution of the program, a result of a function based on a portion of the program;
> >
> > comparing, by the self-checking code sequence, the result with a predefined value;
> >
> > determining, by the self-checking code sequence, that the result does not match a predefined value based on the comparison; and
> >
> > triggering a tamper response mechanism based on the determination that the result does not match the predefined value.

134. Third parties, including program developers who are customers of Irdeto in the United States and in Texas, such as Gearbox Software and other customers in Texas, have directly infringed the ’788 Patent using the Accused Instrumentalities. Each time an Irdeto customer uses the Accused Instrumentalities to build a protected program, the resulting program, when executed, performs the operations claimed in the ’788 Patent. These protected programs are distributed to and executed by end users in the United States, thereby infringing at least claim 1 of the ’788 Patent.

---

[85] Claim 1 is representative. Plaintiff reserves the right to identify additional infringed claims, and further detail Irdeto’s infringement in its Infringement Contentions at the time required under this Court’s scheduling order.

135. Irdeto has induced infringement of the ’788 Patent by third parties in violation of 35 U.S.C. § 271(b). Irdeto has actively induced infringement of the ’788 Patent by intentionally encouraging, instructing, and facilitating the use of the Accused Instrumentalities by its customers—including program developers in the United States—to create self-checking programs that practice the claimed invention of the ’788 Patent.[86] For example, Irdeto markets itself as “[e]asy to integrate,” “[p]lug-and-protect in minutes” and that its “engineers will inject the protection into the optimal place and set it up for you.”[87]

136. The Accused Instrumentalities create protected programs that are stored on non-transitory computer-readable storage media and distributed to end users.

137. Programs protected by the Accused Instrumentalities use self-checking code sequences. For example, Denuvo’s “seemingly random .VM checks” “construct a constant” and use that “constant [] to perform calculations that would break given the constant changed” on portions of the program they cover.[88] Another example is Denuvo’s “Pre-OEP checks,” a form of “user integrity check.”[89] These checks are executed while the program is running. For example, Denuvo’s “integrity verification” “validates code and data at startup and runtime.”[90]

138. Through self-checking codes, programs protected by the Accused Instrumentalities run functions through sections of the code and compare the result to a pre-defined value. The pre-defined value is the expected result when no tampering or improper modification has occurred.

---

[86] *See*, *e.g.*, *Video Game Security Solutions*, *supra* note 29; *Video Game Anti-Piracy*, *supra* note 29; *Anti-Tamper*, *supra* note 22; *Keeping the Fight Fair—Busting Myths Around Denuvo Anti-Cheat*, *supra* note 29; Ullmann, *supra* note 29; *Anti-Piracy*, *supra* note 29; *Protect Your Game Against Piracy from Day One*, *supra* note 29.
[87] *Anti-Piracy*, *supra* note 29; *Protect Your Game Against Piracy from Day One*, *supra* note 29.
[88] Jay, *supra* note 31.
[89] *Id.*
[90] *Anti-Tamper*, *supra* note 22.

For example, Denuvo's "seemingly random .VM checks"[91] function in this way, as do its "Pre-OEP checks," which compare the runtime calculation and the predefined value to "check if it is equal to what it should be."[92] When the result does not match the pre-defined value, programs protected by the Accused Instrumentalities trigger a tamper response.

139. Programs protected by the Accused Instrumentalities determine whether the result matches the predefined value and trigger a tamper response mechanism based on that. For example, in Denuvo's "seemingly random .VM checks," when the "resulting value in R13 would differ" from the expected result calculated based on the constructed constant, the program triggers a response.[93] As another example, Denuvo protected programs trigger a response when tampering is suspected.[94] The triggered response includes, without limitation, monitoring, logging, reporting and engaging defensive mechanisms, as well as any other functionalities offering comparable safeguards.[95]

140. Irdeto has directly infringed the '788 Patent through its own operation of the programs protected by the Accused Instrumentalities, which meet every element of exemplary Claim 1 as set forth above, including during testing of its products and provision of services.

141. Irdeto knew of the '788 patent and knew of its infringement at least because Irdeto became aware of ITP's software self-checking systems and methods patent family during prosecution in 2014, when the PTO Examiner specifically cited InterTrust's '620 Application as a prior art reference to one of Irdeto's own patent applications (Application No. 13/583,965). This Intertrust '620 Application, which Irdeto learned of by at least 2014, references both the

---

[91] Jay, *supra* note 31.
[92] *Id.*
[93] *Id.*
[94] *Denuvo in Games: What You Need to Know*, *supra* note 65.
[95] *Id.*; Jay, *supra* note 31.

provisional application (No. 60/297,451) and non-provisional application (No. 10/172,682) from which the remaining Asserted Patents in this software self-checking systems and methods patent family issued, including the ’788 Patent.

142. Irdeto knew of the ’788 Patent and knew that its customers’ use of the Accused Instrumentalities would constitute infringement of the ’788 Patent, or it was willfully blind to such infringement. Irdeto knew that the Accused Instrumentalities are specifically designed to produce self-checking programs that practice the ’788 Patent.

143. Irdeto specifically intended to induce infringement of the ’788 Patent. As discussed above, Irdeto markets itself as “[e]asy to integrate,” “[p]lug-and-protect in minutes” and that its “engineers will inject the protection into the optimal place and set it up for you.”[96] Irdeto provides its customers with detailed instructions, documentation, tutorials, and technical support directing them to use the Accused Instrumentalities in a manner that produces infringing programs. For example, Irdeto publishes blog posts, product documentation, and marketing materials that describe and encourage the use of the Accused Functionalities.[97] Irdeto’s documentation instructs customers to integrate these features into their programs, and Irdeto’s products are designed so that these infringing features are automatically embedded into the customer’s program when the Accused Instrumentalities are used as directed.

144. Irdeto’s direct and induced infringement have been without license from ITP. Irdeto’s acts of infringement have damaged ITP, as owner of the ’788 Patent. ITP is entitled to

---

[96] *Anti-Piracy*, *supra* note 29; *Protect Your Game Against Piracy from Day One*, *supra* note 29.

[97] *See, e.g.*, *Video Game Security Solutions*, *supra* note 29; *Video Game Anti-Piracy*, *supra* note 29; *Anti-Tamper*, *supra* note 22; *Keeping the Fight Fair—Busting Myths Around Denuvo Anti-Cheat*, *supra* note 29; Ullmann, *supra* note 29; *Anti-Piracy*, *supra* note 29; *Protect Your Game Against Piracy from Day One*, *supra* note 29.

recover the damages it has sustained as a result of Irdeto's wrongful acts in an amount subject to proof at trial.

145. Irdeto's direct and induced infringement of ITP's '788 Patent have been willful.

**Count VII: Infringement of U.S. Patent No. 9,953,159**

146. All preceding factual allegations above are incorporated as if fully set forth herein.

147. The United States Patent and Trademark Office duly and legally issued the '159 Patent, entitled "Software Self-Checking Systems and Methods." All right, title, and interest in the '159 Patent have been assigned to ITP.

148. The '159 Patent is valid, enforceable, and was duly issued in full compliance with Title 35 of the United States Code.

149. Claim 1 of the '159 Patent[98] recites:

> A non-transitory computer-readable storage medium, the computer-readable storage medium storing programming instructions that, if executed by a processor of a computer system, are operable to cause the computer system to perform a method comprising:
>
> > loading a memory address obfuscating value;
> >
> > calculating an address locator value at least in part based on said memory address obfuscating value;
> >
> > reading a first portion of memory beginning at an address determined by said calculated address locator value, said first portion of memory at least in part used to store instructions associated with a currently executing program;
> >
> > calculating a first integrity check value based on the contents of said first portion of memory;
> >
> > comparing said first calculated integrity check value to a first expected check value; and

[98] Claim 1 is representative. Plaintiff reserves the right to identify additional infringed claims, and further detail Irdeto's infringement in its Infringement Contentions at the time required under this Court's scheduling order.

initiating one or more response actions at least in part based on the results of said step of comparing said first calculated check value.

150. Third parties, including program developers who are customers of Irdeto in the United States and in Texas, such as Gearbox Software and other customers in Texas, have directly infringed the '159 Patent using the Accused Instrumentalities to create, distribute, and execute programs that practice the claimed invention of the '159 Patent. Each time an Irdeto customer uses the Accused Instrumentalities to build a protected program, the resulting programs, when executed, perform the operations claimed in the '159 Patent. These protected programs are distributed to and executed by end users in the United States, thereby infringing at least Claim 1 of the '159 Patent.

151. Irdeto has induced infringement of the '159 Patent by third parties in violation of 35 U.S.C. § 271(b). Irdeto has actively induced infringement of the '159 Patent by intentionally encouraging, instructing, and facilitating the use of the Accused Instrumentalities by its customers—including program developers in the United States—to create self-checking programs that practice the '159 Patent.[99] For example, Irdeto markets itself as "[e]asy to integrate," "[p]lug-and-protect in minutes" and that its "engineers will inject the protection into the optimal place and set it up for you."[100]

152. The Accused Instrumentalities, when used by third-party developers as Irdeto instructs and intends, produce programs that infringe the '159 Patent. By way of example, Denuvo's obfuscation techniques include loading values that are later used to recover the true value, which may be a memory address.[101]

---

[99] *See*, *e.g.*, *Video Game Security Solutions*, *supra* note 29; *Video Game Anti-Piracy*, *supra* note 29; *Anti-Tamper*, *supra* note 22; *Keeping the Fight Fair—Busting Myths Around Denuvo Anti-Cheat*, *supra* note 29; Ullmann, *supra* note 29; *Anti-Piracy*, *supra* note 29; *Protect Your Game Against Piracy from Day One*, *supra* note 29.

[100] *Anti-Piracy*, *supra* note 29; *Protect Your Game Against Piracy from Day One*, *supra* note 29.

[101] Elf, *supra* note 49.

```
0000000141958B2A 48:8D15 EF7ED8FE lea rdx,qword ptr ds:[<aOriginstartupE>]
0000000141958B31 B9 0FA2FFE7 mov ecx,E7FFA20F
0000000141958B36 4C:89CB mov rbx,r9
0000000141958B39 4C:89C7 mov rdi,r8
0000000141958B3C 8D89 F15D001B lea ecx,qword ptr ds:[rcx+1B005DF1]
0000000141958B42 E8 690F0300 call <unravel_dump_scy.EA_CALLBACK>
```

***

What's off here? Normally the first argument is in the rcx register. It's formed by adding two constants: E7FFA20F + 1B005DF1 = 103000000. Since all operations are on a 32-bit register, the final value that Hex-Rays shows is 0x3000000 (the upper 1 drops due to 32-bit truncation). A compiler would make the same simplification during optimization. So the constant 0x3000000 was deliberately split into two parts.

Let's take a closer look at the first operand of the addend: `B9 0FA2FFE7 mov ecx,E7FFA20F`. Why the operand, Holmes? Probably because it's easier to slip an assembly instruction inside it—i.e., use the classic "jump into the middle of an instruction," `0FA2`... To test this hypothesis, let's replace the opcode `B9` with `90` (`nop` — "do nothing").

153. Moreover, obfuscation is central to Irdeto's protection architecture. For example, Denuvo's anti-exception-based-hooking architecture writes "important values high up in 'unused' stack space" before executing.[102] Denuvo also "stores things like register values with their bytes / bits scattered everywhere," producing assembly code that "is extremely obfuscated and illegible."[103] Irdeto further markets Denuvo's "code obfuscation" as making code "difficult to read, copy and tamper with."[104] These obfuscation techniques involve loading values that obscure the true memory addresses of program functions and code segments.

---

[102] Jay, *supra* note 31.
[103] *Id.*
[104] *Anti-Piracy*, *supra* note 29.

**Anti-Exception-Based Hooking**

In the early days, Denuvo was attacked primarily by patching every hardware information check, ensuring that it returned the correct information required for the correct constant to be calculated later onwards. One method that was frequently used, was to intercept CPUID and SYSCALL instructions via an exception-based hook. Although one could nicely Register a vector exception handler using the Windows API. The main approach was to instead replace each CPUID and SYSCALL instruction with a UD2 instruction, to trigger and INVALID_OPCODE_EXCEPTION, and hook KiUserExceptionDispatcher to load the correct hardware information into the correct registers when required.

This approach worked well, namely because both CPUID and SYSCALL are two bytes long, and so you only had to patch a single byte to hook them. However, Denuvo implemented a rather genius patch. Prior to executing the CPUID handler, Denuvo will write important values high up in "unused" stack space. Then, later on, it will retrieve this value to make important calculations that would cause undefined behaviour otherwise. This destroyed any exception-based hooking since majority of the time an exception is triggered, Windows will write an EXCEPTION_RECORD high up in unused stack space. You can probably see where this is going. Now, whenever the CPUID is hooked via an exception, that important value will become overwritten with an EXCEPTION_RECORD, causing undefined behaviour later on. I believe this can be bypassed if you attach a debugger to the process and set certain flags when it comes to exception handling, but the method of patching every hardware check is still cumbersome due to randomness anyway.

**Bit Vector**

Probably my favourite thing about Denuvo is that unlike traditional VMs (e.g. VMP and Themida), Denuvo doesn't store values in contiguous memory. Instead, they decide to store things like register values with their bytes / bits scattered everywhere. This makes it incredibly difficult to see what is going on, especially when operations are being performed on said values. This is probably the best example I can provide of Denuvo writing a value bit by bit:

***

**Randomness**

Randomness is a corner stone of the protection. Without it, patching checks would be extremely trivial. Unlike other protection schemes, Denuvo doesn't utilise any API or the x86 RDRAND instruction. Instead, Denuvo opt to use values from the native registers. This is genius as the inputs are basically guaranteed to change, whether that be due to an image base relocation, or perhaps the player's character in game lost health.

One method used by Denuvo, and perhaps the only, is to generate randomness based on a native game register value using modular arithmetic. Here is a real example from a Denuvo protected executable:

***NOTE:*** I'm unable to provide the assembly because it is extremely obfuscated and illegible, but this C demo should be sufficient.




154. Programs protected by the Accused Instrumentalities calculate an address locator value at least in part based on said memory address obfuscating value. For example, Denuvo recovers the true value by adding two constants. [105] Moreover, Denuvo's obfuscation of memory addresses—including by "stor[ing] things like register values with their bytes/bits scattered everywhere"—would, if uncorrected, prevent Denuvo's integrity checks from operating on the correct portions of the program. Because Denuvo's integrity checks do operate correctly on the intended portions, the protected program necessarily calculates an address locator value, at least in part based on the obfuscating value, that allows the program to recover the true memory address of each portion to be checked.[106]

155. Programs protected by the Accused Instrumentalities read a first portion of memory beginning at an address determined by said calculated address locator value, said first portion of memory at least in part used to store instructions associated with a currently executing program. For example, as discussed above, Denuvo's protected programs obfuscate the memory addresses they use. At the same time, Denuvo's runtime integrity checks, including "code integrity checks,"

[105] Elf, *supra* note 49.
[106] Jay, *supra* note 31.

"seemingly random .VM checks" and "user integrity checks" reliably read the right portions of the protected program's memory and catch tampering every time.[107] These functionalities align such that the integrity-checking code reads portions of memory beginning at addresses determined by the calculated address locator values.

156. Programs protected by the Accused Instrumentalities calculate a first integrity check value based on the contents of the first portion of memory. For example, Denuvo's "seemingly random .VM checks" "construct a constant" and use that "constant [] to perform calculations that would break given the constant changed" on portions of the program they cover.[108] As another example, Denuvo's "Pre-OEP checks," a form of "user integrity check," perform a calculation on a portion of the program.[109] These checks perform while the program is running. For example, Denuvo's "integrity verification" "validates code and data at startup and runtime."[110]

157. Programs protected by the Accused Instrumentalities compare said first calculated integrity check value to a first expected check value. By way of example, Denuvo's "seemingly random .VM checks" compare the calculated value against a first expected check value, which is the expected calculation result when the constant has not been improperly modified.[111] As another example, Denuvo's "Pre-OEP checks" compare the runtime calculation and a first expected check value to "check if it is equal to what it should be." The first expected check value is "what it should be" when the program has not been improperly modified.[112]

---

[107] *Id.*
[108] *Id.*
[109] *Id.*
[110] *Anti-Tamper*, *supra* note 22.
[111] Jay, *supra* note 31.
[112] *Id.*

158. Programs protected by the Accused Instrumentalities initiate one or more response actions after comparing the result to the expected value, including initiating response actions when the calculation is not "equal to what it should be" or when "the result is not as expected."[113] The initiated response action includes, without limitation, monitoring, logging, reporting and engaging defensive mechanisms, as well as any other functionalities offering comparable safeguards.[114]

159. Irdeto has directly infringed the '159 Patent through its own operation of the programs protected by the Accused Instrumentalities, which meet every element of exemplary Claim 1 as set forth above, including during testing of its products and provision of services.

160. Irdeto knew of the '159 patent and knew of its infringement at least because Irdeto became aware of ITP's software self-checking systems and methods patent family during prosecution in 2014, when the PTO Examiner specifically cited InterTrust's '620 Application as a prior art reference to one of Irdeto's own patent applications (Application No. 13/583,965). This Intertrust '620 Application, which Irdeto learned of by at least 2014, references both the provisional application (No. 60/297,451) and non-provisional application (No. 10/172,682) from which the remaining Asserted Patents in this software self-checking systems and methods patent family issued, including the '159 Patent.

161. Irdeto knew of the '159 Patent and knew that its customers' use of the Accused Instrumentalities would constitute infringement of the '159 Patent, or it was willfully blind to such infringement. Irdeto knew that the Accused Instrumentalities are specifically designed to produce self-checking programs that practice the '159 Patent.

---

[113] *Id.*

[114] *Id.*; *Denuvo in Games: What You Need to Know*, *supra* note 65.

162. Irdeto specifically intended to induce infringement of the '159 Patent. As discussed above, Irdeto markets itself as "[e]asy to integrate," "[p]lug-and-protect in minutes" and that its "engineers will inject the protection into the optimal place and set it up for you."[115] Irdeto provides its customers with detailed instructions, documentation, tutorials, and technical support directing them to use the Accused Instrumentalities in a manner that produces infringing programs. For example, Irdeto publishes blog posts, product documentation, and marketing materials that describe and encourage the use of the Accused Instrumentalities.[116] Irdeto's documentation instructs customers to integrate these features into their programs, and Irdeto's products are designed so that these infringing features are automatically embedded into the customer's program when the Accused Instrumentalities are used as directed.

163. Irdeto's direct and induced infringement has been without license from ITP. Irdeto's acts of infringement have damaged ITP, as owner of the '159 Patent. ITP is entitled to recover the damages it has sustained as a result of Irdeto's wrongful acts in an amount subject to proof at trial.

164. Irdeto's direct and induced infringement of ITP's '159 Patent have been willful.

**Count VIII: Infringement of U.S. Patent No. 10,423,779**

165. All preceding factual allegations above are incorporated as if fully set forth herein.

166. The United States Patent and Trademark Office duly and legally issued the '779 Patent, entitled "Software Self-Checking Systems and Methods." All right, title, and interest in the '779 Patent have been assigned to ITP.

---

[115] *Anti-Piracy*, *supra* note 29; *Protect Your Game Against Piracy from Day One*, *supra* note 29.

[116] *See, e.g.*, *Video Game Security Solutions*, *supra* note 29; *Video Game Anti-Piracy*, *supra* note 29; *Anti-Tamper*, *supra* note 22; *Keeping the Fight Fair—Busting Myths Around Denuvo Anti-Cheat*, *supra* note 29; Ullmann, *supra* note 29; *Anti-Piracy*, *supra* note 29; *Protect Your Game Against Piracy from Day One*, *supra* note 29.

167. The ’779 Patent is valid, enforceable, and was duly issued in full compliance with Title 35 of the United States Code.

168. Claim 1 of the ’779 Patent[117] recites:

> A non-transitory computer-readable storage medium storing programming instructions that, if executed by a processor of a computer system, are operable to cause the computer system to perform a method of determining an integrity of a program, the method comprising:
>
> > performing, using a first self-checking code sequence included in the program during execution of the program, a check of the integrity of a first portion of the program;
> >
> > determining, based on the check of the integrity of the first portion of the program by the first self-checking code sequence, that the first portion of the program has been modified;
> >
> > performing, using a second self-checking code sequence included in the program during execution of the program, a check of the integrity of a second portion of the program, the second portion of the program comprising a tamper response mechanism;
> >
> > determining, based on the check of the integrity of the second portion of the program by the second self-checking code sequence, that the second portion of the program has not been modified; and
> >
> > triggering the tamper response mechanism based on determining that the first portion of the program has been modified and that the second portion of the program has not been modified.

169. Third parties, including program developers who are customers of Irdeto in the United States and in Texas, such as Gearbox Software and other customers in Texas, have directly infringed the ’779 Patent using the Accused Instrumentalities to create, distribute, and execute self-checking programs that practice the claimed invention of the ’779 Patent. Each time an Irdeto customer uses the Accused Instrumentalities to build a protected program, the resulting program

[117] Claim 1 is representative. Plaintiff reserves the right to identify additional infringed claims, and further detail Irdeto’s infringement in its Infringement Contentions at the time required under this Court’s scheduling order.

binary constitutes a self-checking program stored in a non-volatile memory that, when executed, performs the operations claimed in the ’779 Patent. These protected programs are distributed to and executed by end users in the United States, thereby infringing at least Claim 1 of the ’779 Patent.

170. Irdeto has induced infringement of the ’779 Patent by third parties in violation of 35 U.S.C. § 271(b). Irdeto has actively induced infringement of the ’779 Patent by intentionally encouraging, instructing, and facilitating the use of the Accused Instrumentalities by its customers—including program developers in the United States—to create self-checking programs that practice the claimed invention of the ’779 Patent.[118] For example, Irdeto markets itself as “[e]asy to integrate,” “[p]lug-and-protect in minutes” and that its “engineers will inject the protection into the optimal place and set it up for you.”[119]

171. For example, Denuvo’s “code integrity checks,” “user integrity checks,” “integrity verification,” and “active anti-tamper” include code sequences that are configured to perform integrity checks on portions of the program they cover during execution of the program, including by detecting manipulations to runtime code, “verify[ing] the integrity of the system,” and “validat[ing] code and data at startup and runtime.”[120] Moreover, Denuvo’s “seemingly random .VM checks” “construct a constant” and use that “constant [] to perform calculations that would break given the constant changed.” The predefined value is the expected result when there has not been any improper tampering or modification.[121] As another example, Denuvo’s “Pre-OEP

---

[118] *See*, *e.g.*, *Video Game Security Solutions*, *supra* note 29; *Video Game Anti-Piracy*, *supra* note 29; *Anti-Tamper*, *supra* note 22; *Keeping the Fight Fair—Busting Myths Around Denuvo Anti-Cheat*, *supra* note 29; Ullmann, *supra* note 29; *Anti-Piracy*, *supra* note 29; *Protect Your Game Against Piracy from Day One*, *supra* note 29.

[119] *Anti-Piracy*, *supra* note 29; *Protect Your Game Against Piracy from Day One*, *supra* note 29.

[120] *Anti-Tamper*, *supra* note 22; Jay, *supra* note 31.

[121] Jay, *supra* note 31.

checks," a form of "user integrity check," perform a calculation on a portion of the program and compare the result against an expected value to "check if it is equal to what it should be." The predefined value is "what it should be" when the program has not been improperly modified.[122]

172. The Accused Instrumentalities do not embed a single integrity-check code sequence; they embed many. Denuvo, for example, inserts multiple code integrity checks and user integrity checks throughout each program, each assigned to a different portion of the program with its own tamper-response trigger.[123]

173. The integrity checks are spread throughout the code, and some are assigned to portions of the program that comprise tamper response mechanism code.[124] Because the Accused Instrumentalities insert multiple integrity checks that are spread throughout different parts of the code, not all of them will flag every modification to the code.

174. Because the Accused Instrumentalities embed multiple independent integrity checks throughout the program, a tamper response will be triggered whenever any single check detects modification—even if other portions of the program, including those containing tamper response code, remain intact.[125] For example, Denuvo's self-verification architecture confirms this: "patching one check triggers integrity failures in others."[126] Programs protected by the Accused Instrumentalities therefore trigger the tamper response mechanism based on determining that one portion of the program has been modified and another has not been modified.

---

[122] *Id.*
[123] *Anti-Tamper*, *supra* note 22; Jay, *supra* note 31; *see also* RD945, *supra* note 37.
[124] *Anti-Tamper*, *supra* note 22; Jay, *supra* note 31; *see also* RD945, *supra* note 37.
[125] Jay, *supra* note 31; RD945, *supra* note 37.
[126] RD945, *supra* note 37.

> **Patching Hardware ID Checks**
>
> Ones first attempt at defeating this protection may be to manually patch each hardware identification check, ensuring that the correct hardware information is returned each time ("correct" here meaning the hardware that will decrypt the correct constant). However, as outlined in the sections above, this proves to be extremely difficult. Not only are you faced with complicated CRC, but also randomness that makes it close to impossible for a single person to find all the checks, let alone patch them.

175. The triggered response includes, without limitation, monitoring, logging, reporting and engaging defensive mechanisms, as well as any other functionalities offering comparable safeguards.[127]

176. Irdeto has directly infringed the '779 Patent through its own operation of the programs protected by the Accused Instrumentalities, which meet every element of exemplary Claim 1 as set forth above, including during testing of its products and provision of services.

177. Irdeto knew of the '779 patent and knew of its infringement at least because Irdeto became aware of ITP's software self-checking systems and methods patent family during prosecution in 2014, when the PTO Examiner specifically cited InterTrust's '620 Application as a prior art reference to one of Irdeto's own patent applications (Application No. 13/583,965). This InterTrust '620 Application, which Irdeto learned of by at least 2014, references both the provisional application (No. 60/297,451) and non-provisional application (No. 10/172,682) from which the remaining Asserted Patents in this software self-checking systems and methods patent family issued, including the '779 Patent.

178. Irdeto knew of the '779 Patent and knew that its customers' use of the Accused Instrumentalities would constitute infringement of the '779 Patent, or it was willfully blind to such infringement. Irdeto knew that the Accused Instrumentalities are specifically designed to produce self-checking programs that practice the method claimed in the '779 Patent.

[127] *Denuvo in Games: What You Need to Know*, *supra* note 65; Jay, *supra* note 31.

179. Irdeto specifically intended to induce infringement of the ’779 Patent. As discussed above, Irdeto markets itself as “[e]asy to integrate,” “[p]lug-and-protect in minutes” and that its “engineers will inject the protection into the optimal place and set it up for you.”[128] Irdeto provides its customers with detailed instructions, documentation, tutorials, and technical support directing them to use the Accused Instrumentalities in a manner that produces infringing programs. For example, Irdeto publishes blog posts, product documentation, and marketing materials that describe and encourage the use of the Accused Instrumentalities—the very functionalities claimed in the ’779 Patent.[129] Irdeto’s documentation instructs customers to integrate these features into their programs, and Irdeto’s products are designed so that these infringing features are automatically embedded into the customer’s program when the Accused Instrumentalities are used as directed.

180. Irdeto’s direct and induced infringement has been without license from ITP. Irdeto’s acts of infringement have damaged ITP, as owner of the ’779 Patent. ITP is entitled to recover the damages it has sustained as a result of Irdeto’s wrongful acts in an amount subject to proof at trial.

181. Irdeto’s direct and induced infringement of ITP’s ’779 Patent have been willful.

**Count IX: Infringement of U.S. Patent No. 10,496,814**

182. All preceding factual allegations above are incorporated as if fully set forth herein.

183. The USPTO duly and legally issued the ’814 Patent. All rights, title, and interest in the ’814 Patent have been assigned to ITP.

---

[128] *Anti-Piracy*, *supra* note 29; *Protect Your Game Against Piracy from Day One*, *supra* note 29.

[129] *See, e.g.*, *Video Game Security Solutions*, *supra* note 29; *Video Game Anti-Piracy*, *supra* note 29; *Anti-Tamper*, *supra* note 22; *Keeping the Fight Fair—Busting Myths Around Denuvo Anti-Cheat*, *supra* note 29; Ullmann, *supra* note 29; *Anti-Piracy*, *supra* note 29; *Protect Your Game Against Piracy from Day One*, *supra* note 29.

184. The ’814 Patent is valid, enforceable, and was duly issued in full compliance with Title 35 of the United States Code.

185. Claim 1 of the ’814 Patent[130] recites:

> A method for verifying the integrity of an application performed by a user device comprising a processor and a non-transitory computer-readable medium storing instructions that, when executed by the processor, cause the processor to perform the method, the method comprising:
>
> > receiving the application from an application store system, the application comprising one or more functional integrity checks;
> >
> > receiving a request to perform an initial execution of the application;
> >
> > in response to receiving the request to perform the initial execution of the application:
> >
> > executing the one or more functional integrity checks of the application to verify that one or more portions of the application associated with the one or more functional integrity checks function according to a defined behavior, wherein executing the one or more functional integrity checks comprises verifying that at least one input and at least one output associated with the one or more portions of the application correspond with an expected input and output behavior;
> >
> > generating, based on verifying that the one or more portions of the application function according to the defined behavior, one or more first integrity check values;
> >
> > storing the one or more first integrity check values on the user device; and
> >
> > allowing, based on the verifying that the one or more portions of the application function according to the defined behavior, the initial execution of the application to proceed.

186. Third parties—including application developers who are customers of Irdeto in the United States and in Texas, such as Gearbox Software and other customers in Texas, and the customers of those application developers—have directly infringed and continue to directly

[130] Claim 1 is representative. Plaintiff reserves the right to identify additional infringed claims, and further detail Irdeto’s infringement in its Infringement Contentions at the time required under this Court’s scheduling order.

infringe the ’814 Patent by using the Accused Instrumentalities to create, distribute, and execute applications that practice the ’814 Patent.

187. Each time an Irdeto customer uses the Accused Instrumentalities to build a protected application, the resulting application performs the operations claimed in the ’814 Patent. These protected applications are distributed to and executed by end users in the United States, thereby infringing at least Claim 1 of the ’814 Patent.

188. Irdeto has induced and continues to induce infringement of the ’814 Patent by third parties in violation of 35 U.S.C. § 271(b). Irdeto has actively induced infringement of the ’814 Patent by intentionally encouraging, instructing, and facilitating the use of the Accused Instrumentalities by its customers—including application developers in the United States—to create integrity verifying applications that practice the claimed invention of the ’814 Patent.[131] For example, Irdeto markets itself as "[e]asy to integrate," "[p]lug-and-protect in minutes" and that its "engineers will inject the protection into the optimal place and set it up for you."[132]

189. Applications protected by the Accused Instrumentalities perform methods for verifying the integrity of an application performed by a user device.[133]

190. A user may acquire applications protected by the Accused Instrumentalities from an application store system, such as Steam.[134]

---

[131] *See*, *e.g.*, *Video Game Security Solutions*, *supra* note 29; *Video Game Anti-Piracy*, *supra* note 29; *Anti-Tamper*, *supra* note 22; *Keeping the Fight Fair—Busting Myths Around Denuvo Anti-Cheat*, *supra* note 29; Ullmann, *supra* note 29; *Anti-Piracy*, *supra* note 29; *Protect Your Game Against Piracy from Day One*, *supra* note 29.

[132] *Anti-Piracy*, *supra* note 29; *Protect Your Game Against Piracy from Day One*, *supra* note 29.

[133] *Video Game Anti-Piracy*, *supra* note 29; *see also* Jay, *supra* note 31; RD945, *supra* note 37.

[134] Ullmann, *supra* note 29.

**What players run: EXE/DLLs vs. source code**

Studios build games in source code, but the version delivered to players is the compiled game binary, typically across EXE/DLLs. Many systems operate together in that shipped runtime, including gameplay systems, audio, platform APIs (for example, Steam APIs), telemetry, middleware and anti-piracy protection.

The shipped binary is not just "gameplay code." It is the runtime environment where these systems operate together.

Once you look at the game this way, one distinction becomes especially important:

- **Functions:** Units of code that perform tasks in the game.
- **Threads:** Execution paths that run those tasks.

In simple terms, functions help define what work is happening, and threads help determine when and where that work is carried out at runtime.

191. Applications protected by the Accused Instrumentalities implement a method for verifying the integrity of an application through functional integrity checks—for example, "Integrity verification" and "Injection prevention."[135]

**Specifications**

- **Operating systems:** Windows 10 and Windows 11 supported.
- **Binary compatibility:** Protects any PE binary using rewriting technology.
- **Engine protection:** Unreal and Unity hardened against public attack tools.
- **Reverse engineering:** Code encryption, obfuscation and virtualization combined.
- **Memory protection:** Monitors runtime memory for unauthorized manipulation.
- **Integrity verification:** Validates code and data at startup and runtime.
- **Injection prevention:** Blocks code injection and unauthorized module loading.
- **Virtual machine detection:** Detects virtualized and emulated execution environments.
- **Hypervisor detection:** Identifies hypervisor-based analysis and manipulation attempts.
- **Integration model:** Post-build binary-level integration without source access.

[135] *Anti-Tamper*, *supra* note 22; *Video Game Anti-Piracy*, *supra* note 29; *see also* Jay, *supra* note 31; RD945, *supra* note 37.



[136]

192. These checks are designed to, for example, "[v]alidate[] code and data at startup and runtime," in other words, the integrity checks run at execution.[137] One such check is a "Pre-OEP" check to make sure the user's hardware identification is consistent.[138]

193. In order to "[v]alidate code and data," applications protected by the Accused Instrumentalities confirm that certain portions of the protected application's code are behaving as expected. For example, after executing a functionality check, applications protected by the Accused Instrumentalities will verify whether a constant associated with a portion of the application is equal to what it should be.[139] Additional verifications include "[r]ead dbdata.dll and verify its watermark," "read the license file 1031469.dfl" "[e]xtract ContentId and make sure it equals 1031469," and confirming that "the secret table is valid" based on hardware identification

[136] *Video Game Anti-Piracy*, *supra* note 29.
[137] *Anti-Tamper*, *supra* note 22.
[138] Jay, *supra* note 31.
[139] *Id.*

information.[140] Denuvo also "builds a license matrix" with timing (RDTSC) and hardware identification information, which is later used while the application executes.[141]

> The key point is that before the OEP, the license check differs in two fundamental ways from protection code that only verifies the license after execution has "passed the OEP stop on the green line," so to speak:
>
> - LIC_CHECK decrypts and distributes the secret DWORDs into their proper slots for triggers that fire after the OEP (Original Entry Point).
> - It also performs an integrity check of the entire table of 214 DWORDs.
>
> Time for a little surprise. Let's start stepping and work our way through the LIC_CHECK procedure toward the OEP (Original Entry Point).
>
> - Read dbdata.dll and verify its watermark. This library builds the request code; its substitution was already demonstrated in the "Tiberium Reversing: Chasing the Denuvo Crack" research (see the video linked in the "WWW" section).
> - Read the license file 1031469.dlf at: %ProgramData%\Electronic Arts\EA Services\License. Extract ContentId and make sure it equals 1031469. Extract GameToken, decrypt it, XOR it with constants, then scatter the resulting table across the section into strictly defined slots located past the RET of the game's main procedures.
> - Out of forty VMProtect 2 contexts, only one is thrown at the LIC_CHECK protection. It can't stand up to our analyzer; we just monitor and patch it when needed. VM_EXIT == 0x1418f3843. The handler with the _READ_DS_DWORD macro, which among other things reads data from the secret table, is at 0x141917511.
> - After Denuvo gathers and processes data from all four blocks, it builds a license matrix which, by using timing (RDTSC), looks pseudo-random each run. You can see it on the stack at offset +0x4A0 if you break on one of the static cpuid calls before the overall check.
> - The decisive check. If the secret table is valid, it jumps to the WinAPI VirtualAlloc and then to the OEP. If not, after some shuffling it calls the WinAPI DeleteFileA on the failed license. Funny detail: before deleting the license, Denuvo calls that WinAPI with the argument C:\—i.e., it literally tries to delete drive C:. Naturally it fails with an error and nothing gets removed, but it leaves a weird aftertaste.

194. These functional integrity checks are integrated into the application itself, before it is distributed to users.[142]

---

[140] Elf, *supra* note 49.
[141] *Id.*
[142] *Id.*; *Anti-Tamper*, *supra* note 22.




195. Irdeto protected applications can run on user devices that include processors and a non-transitory computer-readable medium storing instructions that, when executed, causes the processor to perform certain operations. For example, Denuvo protected applications can run on "PC, console and mobile."[143]

196. Irdeto directly infringes the '814 Patent through its own operation of the applications protected by the Accused Instrumentalities, which meet every element of exemplary Claim 1 as set forth above, including during testing of its products and provision of services.

197. Irdeto knew of the '814 Patent at least as of the date of the service of ITP's Original Complaint.

198. Irdeto knew of the '814 Patent and knew that its customers' use of the Accused Instrumentalities would constitute infringement of the '814 Patent, or it was willfully blind to such infringement. Irdeto knew that the Accused Instrumentalities are specifically designed to perform

---

[143] *Video Game Security Solutions*, *supra* note 29.

a method for verifying the integrity of an application in a manner that practices the operations claimed in the ’814 Patent.

199. Irdeto specifically intended to induce infringement of the ’814 Patent. As discussed above, Irdeto markets itself as “[e]asy to integrate,” “[p]lug-and-protect in minutes” and that its “engineers will inject the protection into the optimal place and set it up for you.”[144] Irdeto provides its customers with detailed instructions, documentation, tutorials, and technical support directing them to use the Accused Instrumentalities in a manner that produces infringing applications. For example, Irdeto publishes product documentation and marketing materials that describe and encourage the use of the very functionalities claimed in the ’814 Patent.[145] Irdeto’s documentation instructs customers to integrate these features into their applications, and Irdeto’s products are designed so that these infringing features are automatically embedded into the customer’s application when the Accused Instrumentalities are used as directed.

200. Irdeto’s direct and induced infringement have been without license from ITP. Irdeto’s acts of infringement have damaged and will continue to damage ITP, as owner of the ’814 Patent. ITP is entitled to recover the damages it has sustained as a result of Irdeto’s wrongful acts in an amount subject to proof at trial.

201. Irdeto’s direct and induced infringement of ITP’s ’814 Patent have been and continue to be willful. At a minimum, Irdeto’s infringement of ITP’s ’814 Patent has been willful at least as of the date of the service of ITP’s Original Complaint.

---

[144] *Anti-Piracy*, *supra* note 29; *Protect Your Game Against Piracy from Day One*, *supra* note 29.

[145] *See, e.g.*, *Video Game Security Solutions*, *supra* note 29; *Video Game Anti-Piracy*, *supra* note 29; *Anti-Tamper*, *supra* note 22; *Keeping the Fight Fair—Busting Myths Around Denuvo Anti-Cheat*, *supra* note 29; Ullmann, *supra* note 29; *Anti-Piracy*, *supra* note 29; *Protect Your Game Against Piracy from Day One*, *supra* note 29.

202. Irdeto's infringement continues each day as detailed above and as will be proven at trial. This ongoing infringement deprives ITP of the exclusive control over the use of its patented technology, and such continued use by Irdeto of ITP's patented inventions against ITP's wishes harms ITP's right to exclude.

**Count X: Infringement of U.S. Patent No. 11,829,469**

203. All preceding factual allegations above are incorporated as if fully set forth herein.

204. The USPTO duly and legally issued the '469 Patent. All rights, title, and interest in the '469 Patent have been assigned to ITP.

205. The '469 Patent is valid, enforceable, and was duly issued in full compliance with Title 35 of the United States Code.

206. Claim 1 of the '469 Patent[146] recites:

> A method for verifying the integrity of an application performed by a user device comprising a processor and a non-transitory computer-readable medium storing instructions that, when executed by the processor, cause the processor to perform the method, the method comprising:
>
> > receiving the application from an application store system, the application comprising one or more functional integrity checks;
> >
> > receiving a request to perform an initial execution of the application;
> >
> > in response to receiving the request to perform the initial execution of the application:
> >
> > executing the one or more functional integrity checks of the application to verify that one or more portions of the application associated with the one or more functional integrity checks function according to a defined behavior, wherein executing the one or more functional integrity checks comprises verifying that one or more resource calls associated with the one or more portions of the application correspond with an expected resource call behavior;

---

[146] Claim 1 is representative. Plaintiff reserves the right to identify additional infringed claims, and further detail Irdeto's infringement in its Infringement Contentions at the time required under this Court's scheduling order.

> generating, based on verifying that the one or more portions of the application function according to the defined behavior, one or more first integrity check values;
>
> storing the one or more first integrity check values on the user device; and
>
> allowing, based on the verifying that the one or more portions of the application function according to the defined behavior, the initial execution of the application to proceed.

207. Third parties—including application developers who are customers of Irdeto in the United States and in Texas, such as Gearbox Software and other customers in Texas, and the customers of those application developers—have directly infringed and continue to infringe the ’469 Patent by using the Accused Instrumentalities to create, distribute, and execute applications that practice the claimed invention of the ’469 Patent.

208. Each time an Irdeto customer uses the Accused Instrumentalities to build a protected application, the resulting application performs the operations claimed in the ’469 Patent. These protected application binaries are distributed to and executed by end users in the United States, thereby infringing at least Claim 1 of the ’469 Patent.

209. Irdeto has induced and continues to induce infringement of the ’469 Patent by third parties in violation of 35 U.S.C. § 271(b). Irdeto has actively induced infringement of the ’469 Patent by intentionally encouraging, instructing, and facilitating the use of Denuvo by its customers—including application developers in the United States—to create integrity verifying applications that practice the claimed invention of the ’469 Patent.[147] For example, Irdeto markets

---

[147] *See*, *e.g.*, *Video Game Security Solutions*, *supra* note 29; *Video Game Anti-Piracy*, *supra* note 29; *Anti-Tamper*, *supra* note 22; *Keeping the Fight Fair—Busting Myths Around Denuvo Anti-Cheat*, *supra* note 29; Ullmann, *supra* note 29; *Anti-Piracy*, *supra* note 29; *Protect Your Game Against Piracy from Day One*, *supra* note 29.

itself as "[e]asy to integrate," "[p]lug-and-protect in minutes" and that its "engineers will inject the protection into the optimal place and set it up for you."[148]

210. Applications protected by the Accused Instrumentalities perform methods for verifying the integrity of an application performed by a user device.[149]

211. A user may acquire applications protected by the Accused Instrumentalities from an application store system, such as Steam.[150]

212. Applications protected by the Accused Instrumentalities implement a method for verifying the integrity of an application through functional integrity checks—for example, "Integrity verification" and "Injection prevention."[151]

**Specifications**

- **Operating systems:** Windows 10 and Windows 11 supported.
- **Binary compatibility:** Protects any PE binary using rewriting technology.
- **Engine protection:** Unreal and Unity hardened against public attack tools.
- **Reverse engineering:** Code encryption, obfuscation and virtualization combined.
- **Memory protection:** Monitors runtime memory for unauthorized manipulation.
- **Integrity verification:** Validates code and data at startup and runtime.
- **Injection prevention:** Blocks code injection and unauthorized module loading.
- **Virtual machine detection:** Detects virtualized and emulated execution environments.
- **Hypervisor detection:** Identifies hypervisor-based analysis and manipulation attempts.
- **Integration model:** Post-build binary-level integration without source access.

213. These checks are designed to, for example, "[v]alidate[] code and data at startup and runtime," in other words, the integrity checks run at execution.[152] One such check is a "Pre-OEP" check to make sure the user's hardware identification is consistent.[153]

---

[148] *Anti-Piracy*, *supra* note 29; *Protect Your Game Against Piracy from Day One*, *supra* note 29.
[149] *Anti-Tamper*, *supra* note 22; *Video Game Anti-Piracy*, *supra* note 29; *see also* Jay, *supra* note 31; RD945, *supra* note 37.
[150] Ullman, *supra* note 29.
[151] *Anti-Tamper*, *supra* note 22; *Video Game Anti-Piracy*, *supra* note 29; *see also* Jay, *supra* note 31; RD945, *supra* note 37.
[152] *Id.*
[153] Jay, *supra* note 31.

214. Applications protected by the Accused Instrumentalities perform resource calls associated with portions of the protected application code and verify whether these resource calls conform with expected behavior. For example, a resource call for performing the user integrity checks using collected hardware identification information and/or the license file corresponds with decrypting the correct stolen constant.[154] Additional examples of resource calls include functions that "[r]ead dbdata.dll and verify its watermark," "read the license file 1031469.dfl" "[e]xtract ContentId and make sure it equals 1031469," and confirm "the secret table is valid" based on hardware identification information.[155] Denuvo also "builds a license matrix" with timing and hardware identification information, which is used later.[156]

215. These functional integrity checks are integrated into the application itself before it is distributed to users.[157]




---

[154] *Id.*
[155] Elf, *supra* note 49.
[156] *Id.*
[157] *Id.*; *Anti-Tamper*, *supra* note 22.

216. Irdeto protected applications can run on user devices that include processors and a non-transitory computer-readable medium storing instructions that, when executed by the processor, cause the processor to perform certain operations—for example, Denuvo protected applications can run on "PC, console and mobile."[158]

217. Irdeto directly infringes the '469 Patent through its own operation of the applications protected by the Accused Instrumentalities, which meet every element of exemplary Claim 1 as set forth above, including during testing of its products and provision of services.

218. Irdeto knew of '469 Patent and its infringement of the '469 Patent at least as of the date of the service of ITP's Original Complaint.

219. Irdeto knew of the '469 Patent and knew that its customers' use of the Accused Instrumentalities would constitute infringement of the '469 Patent, or it was willfully blind to such infringement. Irdeto knew that the Accused Instrumentalities are specifically designed to perform a method for verifying the integrity of an application in a manner that practices the operations claimed in the '469 Patent.

220. Irdeto specifically intended to induce infringement of the '469 Patent. As discussed above, Irdeto markets itself as "[e]asy to integrate," "[p]lug-and-protect in minutes" and that its "engineers will inject the protection into the optimal place and set it up for you."[159] Irdeto provides its customers with detailed instructions, documentation, tutorials, and technical support directing them to use the Accused Instrumentalities in a manner that produces infringing applications. For example, Irdeto publishes blog posts, product documentation, and marketing materials that

---

[158] *Video Game Security Solutions*, *supra* note 29.

[159] *Anti-Piracy*, *supra* note 29; *Protect Your Game Against Piracy from Day One*, *supra* note 29.

describe and encourage the use of the Accused Instrumentalities.[160] Irdeto's documentation instructs customers to integrate these features into their applications, and Irdeto's products are designed so that these infringing features are automatically embedded into the customer's application when the Accused Instrumentalities are used as directed.

221. Irdeto's direct and induced infringement have been without license from ITP. Irdeto's acts of infringement have damaged and will continue to damage ITP, as owner of the '469 Patent. ITP is entitled to recover the damages it has sustained as a result of Irdeto's wrongful acts in an amount subject to proof at trial.

222. Irdeto's direct and induced infringement of ITP's '469 Patent have been and continue to be willful. At a minimum, Irdeto's infringement of ITP's '469 Patent has been willful at least as of the date of the service of ITP's Original Complaint.

223. Irdeto's infringement continues each day as detailed above and as will be proven at trial. This ongoing infringement deprives ITP of the exclusive control over the use of its patented technology, and such continued use by Irdeto of ITP's patented inventions against ITP's wishes harms ITP's right to exclude.

**Count XI: Infringement of U.S. Patent No. 12,254,085**

224. All preceding factual allegations above are incorporated as if fully set forth herein.

225. The USPTO duly and legally issued the '085 Patent. All rights, title, and interest in the '085 Patent have been assigned to ITP.

---

[160] *See, e.g.*, *Video Game Security Solutions*, *supra* note 29; *Video Game Anti-Piracy*, *supra* note 29; *Anti-Tamper*, *supra* note 22; *Keeping the Fight Fair—Busting Myths Around Denuvo Anti-Cheat*, *supra* note 29; Ullmann, *supra* note 29; *Anti-Piracy*, *supra* note 29; *Protect Your Game Against Piracy from Day One*, *supra* note 29.

226. The ’085 Patent is valid, enforceable, and was duly issued in full compliance with Title 35 of the United States Code.

227. Claim 1 of the ’085 Patent[161] recites:

> A non-transitory computer-readable medium storing instructions that, when executed by at least one processor of a system, cause the system to perform a method comprising:
>
> > detecting an initial execution of an application on the system, the application having been received from an application store system, the application comprising one or more functional integrity checks;
> >
> > executing, at least in part in response to the detection of the initial execution, the one or more functional integrity checks of the application to verify that one or more portions of the application associated with the one or more functional integrity checks function according to a defined behavior, wherein executing the one or more functional integrity checks comprises verifying that one or more resource calls associated with the one or more portions of the application correspond with an expected resource call behavior;
> >
> > generating, based on verifying that the one or more portions of the application function according to the defined behavior, one or more first integrity check values;
> >
> > storing the one or more first integrity check values on a user device; and
> >
> > allowing, based on the verifying that the one or more portions of the application function according to the defined behavior, the initial execution of the application to proceed.

228. Third parties—including application developers who are customers of Irdeto in the United States and in Texas, such as Gearbox Software and other customers in Texas—have infringed and continue to directly infringe the ’085 Patent by using the Accused Instrumentalities to create, distribute, and execute integrity verifying applications that practice the claimed invention of the ’085 Patent.

---

[161] Claim 1 is representative. Plaintiff reserves the right to identify additional infringed claims, and further detail Irdeto’s infringement in its Infringement Contentions at the time required under this Court’s scheduling order.

229. Each time an Irdeto customer uses the Accused Instrumentalities to build a protected application, the resulting application, when executed, performs the operations claimed in the ’085 Patent. These protected applications are distributed to and executed by end users in the United States, thereby inducing infringement of at least Claim 1 of the ’085 Patent.

230. Irdeto has induced and continues to induce infringement of the ’085 Patent by third parties in violation of 35 U.S.C. § 271(b). Irdeto has actively induced infringement of the ’085 Patent by intentionally encouraging, instructing, and facilitating the use of Denuvo by its customers—including application developers in the United States—to create integrity verifying applications that practice the claimed invention of the ’085 Patent.[162] For example, Irdeto markets itself as “[e]asy to integrate,” “[p]lug-and-protect in minutes” and that its “engineers will inject the protection into the optimal place and set it up for you.”[163]

231. Applications protected by the Accused Instrumentalities perform methods for verifying the integrity of an application performed by a user device.[164]

232. Applications protected by the Accused Instrumentalities comprise one or more functional integrity checks included in the application.

233. A user may acquire applications protected by the Accused Instrumentalities from an application store system, such as Steam.[165]

---

[162] *See*, *e.g.*, *Video Game Security Solutions*, *supra* note 29; *Video Game Anti-Piracy*, *supra* note 29; *Anti-Tamper*, *supra* note 22; *Keeping the Fight Fair—Busting Myths Around Denuvo Anti-Cheat*, *supra* note 29; Ullmann, *supra* note 29; *Anti-Piracy*, *supra* note 29; *Protect Your Game Against Piracy from Day One*, *supra* note 29.
[163] *Anti-Piracy*, *supra* note 29; *Protect Your Game Against Piracy from Day One*, *supra* note 29.
[164] *Anti-Tamper*, *supra* note 22; *Video Game Anti-Piracy*, *supra* note 29; *see also* Jay, *supra* note 31; RD945, *supra* note 37.
[165] Ullman, *supra* note 29.

234. Applications protected by the Accused Instrumentalities implement a method for verifying the integrity of an application through functional integrity checks—for example, "Integrity verification" and "Injection prevention."[166]

**Specifications**

- **Operating systems:** Windows 10 and Windows 11 supported.
- **Binary compatibility:** Protects any PE binary using rewriting technology.
- **Engine protection:** Unreal and Unity hardened against public attack tools.
- **Reverse engineering:** Code encryption, obfuscation and virtualization combined.
- **Memory protection:** Monitors runtime memory for unauthorized manipulation.
- **Integrity verification:** Validates code and data at startup and runtime.
- **Injection prevention:** Blocks code injection and unauthorized module loading.
- **Virtual machine detection:** Detects virtualized and emulated execution environments.
- **Hypervisor detection:** Identifies hypervisor-based analysis and manipulation attempts.
- **Integration model:** Post-build binary-level integration without source access.

235. These functional integrity checks are integrated into the application itself.[167]

**Benefits**

**Disrupt cheat creation**
Prevent reverse engineering and tampering that form the basis of advanced cheats

**Protect player trust**
Support fair competition by reducing cheat availability and preserving a level playing field

**Reduce player churn**
Limit cheating-driven frustration that causes players to abandon affected games

**Simplify security delivery**
Enable post-build integration so teams focus on development, not security

**Rely on proven expertise**
Access experienced specialists with rapid response and 24/7 emergency support

**Operate without intrusion**
Run protection fully offline in user mode

---

[166] *Anti-Tamper*, *supra* note 22; *Video Game Anti-Piracy*, *supra* note 29; *see also* Jay, *supra* note 31; RD945, *supra* note 37.
[167] *Id.*

236. Applications protected by the Accused Instrumentalities perform resource calls associated with portions of the protected application code and verify whether these resource calls conform with expected behavior. For example, a resource call for performing the user integrity checks using collected hardware identification information and/or the license file corresponds with decrypting the correct stolen constant.[168] Additional resource calls include functions that "[r]ead dbdata.dll and verify its watermark," "read the license file 1031469.dfl" "[e]xtract ContentId and make sure it equals 1031469," and confirm "the secret table is valid" based on hardware identification information.[169] Denuvo also "builds a license matrix" with timing and hardware identification information, which is used later.[170]

237. Irdeto protected applications can run on user devices that include processors and a non-transitory computer-readable medium storing instructions that, when executed by the processor, cause the processor to perform certain operations—for example, Denuvo protected applications can run on "PC, console and mobile."[171]

238. Irdeto directly infringes the '085 Patent through its own operation of the applications protected by the Accused Instrumentalities, which meet every element of at least exemplary Claim 1 as set forth above, including during testing of its products and provision of services.

239. Irdeto knew of '085 Patent and its infringement of the '085 Patent at least as of the date of the service of ITP's Original Complaint.

---

[168] Jay, *supra* note 31.
[169] Elf, *supra* note 49.
[170] *Id.*
[171] *Video Game Security Solutions*, *supra* note 29.

240. Irdeto knew of the ’085 Patent and knew that its customers’ use of the Accused Instrumentalities would constitute infringement of the ’085 Patent, or it was willfully blind to such infringement. Irdeto knew that the Accused Instrumentalities are specifically designed to produce integrity verifying applications that practice the operations claimed in the ’085 Patent.

241. Irdeto specifically intended to induce infringement of the ’085 Patent. As discussed above, Irdeto markets itself as “[e]asy to integrate,” “[p]lug-and-protect in minutes” and that its “engineers will inject the protection into the optimal place and set it up for you.”[172] Irdeto provides its customers with detailed instructions, documentation, tutorials, and technical support directing them to use the Accused Instrumentalities in a manner that produces infringing applications. For example, Irdeto publishes product documentation and marketing materials that describe and encourage the use of the very functionalities claimed in the ’085 Patent.[173] Irdeto’s documentation instructs customers to integrate these features into their applications, and Irdeto’s products are designed so that these infringing features are automatically embedded into the customer’s application when the Accused Instrumentalities are used as directed.

242. Irdeto’s direct and induced infringement have been without license from ITP. Irdeto’s acts of infringement have damaged and will continue to damage ITP, as owner of the ’085 Patent. ITP is entitled to recover the damages it has sustained as a result of Irdeto’s wrongful acts in an amount subject to proof at trial.

---

[172] *Anti-Piracy*, *supra* note 29; *Protect Your Game Against Piracy from Day One*, *supra* note 29.

[173] *See, e.g.*, *Video Game Security Solutions*, *supra* note 29; *Video Game Anti-Piracy*, *supra* note 29; *Anti-Tamper*, *supra* note 22; *Keeping the Fight Fair—Busting Myths Around Denuvo Anti-Cheat*, *supra* note 29; Ullmann, *supra* note 29; *Anti-Piracy*, *supra* note 29; *Protect Your Game Against Piracy from Day One*, *supra* note 29.

243. Irdeto's direct and induced infringement of ITP's '085 Patent have been and continue to be willful. At a minimum, Irdeto's infringement of ITP's '085 Patent has been willful at least as of the date of the service of ITP's Original Complaint.

244. Irdeto's infringement continues each day as detailed above and as will be proven at trial. This ongoing infringement deprives ITP of the exclusive control over the use of its patented technology, and such continued use by Irdeto of ITP's patented inventions against ITP's wishes harms ITP's right to exclude.

**Jury Demand**

245. ITP hereby demands a trial by jury on all issues.

**Prayer**

Wherefore, ITP prays for entry of judgment as follows:

246. A judgment in favor of ITP that Irdeto has infringed the Asserted Patents either literally and/or under the doctrine of equivalents, and is infringing the '814, '469, and '085 Patents either literally and/or under the doctrine of equivalents;

247. A judgment in favor of ITP that Irdeto's infringement of the Asserted Patents is willful and continues to be willful as of the date Irdeto received notice of its infringement through this lawsuit;

248. An award of damages in favor of ITP adequate to compensate ITP for Irdeto's infringement of the Asserted Patents which shall in no event be less than a reasonable royalty, together with interest and cost as fixed by the court pursuant to 35 U.S.C. § 284;

249. An award of enhanced damages in favor of ITP against Irdeto for up to three times the award of actual damages for Irdeto's willful infringement of the Asserted Patents pursuant to 35 U.S.C. § 284;

250. A permanent injunction in favor of ITP against Irdeto enjoining Irdeto, its officers, agents, employees, and others acting in privity, from further infringement of at least the ’814, ’469, and ’085 Patents;

251. An award of an ongoing royalty for Irdeto’s post-judgment infringement in the event a permanent injunction is not granted;

252. An award of attorneys’ fees pursuant to 35 U.S.C. § 285 or as otherwise permitted by law in an amount deemed just and appropriate by the Court;

253. An award of costs and expenses as deemed appropriate by the Court; and

Any other legal or equitable relief to which ITP is justly entitled.

Dated: June 5, 2026

*/s/ Jason S. McManis*
Jason S. McManis
State Bar No.: 24088032
jmcmanis@azalaw.com
Weining Bai
State Bar No.: 24101477
wbai@azalaw.com
Thomas DelRosario
State Bar No.: 24110645
wbai@azalaw.com
Savannah Ezelle
State Bar No.: 24125223
sezelle@azalaw.com
Chun Deng
State Bar No.: 24133178
cdeng@azalaw.com
Sean Healey
State Bar No.: 24142997
shealey@azalaw.com
**AHMAD, ZAVITSANOS & MENSING, PLLC**
1221 McKinney Street, Suite 2500
Houston, Texas 77010
(713) 655-1101

Warren McCarty
State Bar No.: 24107857
wmccarty@azalaw.com
Ariane Mann
State Bar No.: 24140399
amann@azalaw.com
Zach Grinovich
State Bar No.: 24149804
zgrinovich@azalaw.com
**AHMAD, ZAVITSANOS & MENSING, PLLC**
2001 Ross Ave, Suite 520
Dallas, TX 75201
(214) 800-4501

Of Counsel:

Andrea L. Fair
Texas Bar No. 24078488
andrea@wsfirm.com
**WARD, SMITH & HILL, PLLC**
1507 Bill Owens Parkway
Longview, Texas 75604
Tel: 903-757-6400
Fax: 903-757-2323

**Attorneys for Plaintiff**